IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 73062-2-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| ROY BELL, JR. | ) | UNPUBLISHED OPINION |
| Appellant. | ) | FILED: May 23, 2016 |

BECKER, J. — Appellant Roy Bell Jr.'s right to confront witnesses against him was not violated when the victim's statements to an officer, made after Bell threatened to kill her and while he was still at large, were admitted. His right to a public trial was not violated when the court conducted off-the-record sidebars regarding a routine evidentiary objection and then promptly memorialized the sidebars on the record. Other alleged errors, even if they occurred, were not prejudicial. We affirm appellant's conviction on three felony counts of violation of a court order and remand for correction of a clerical error in the judgment and sentence.

FACTS

On December 20, 2013, the King County Superior Court entered a domestic violence no-contact order prohibiting Roy Bell Jr. from contacting TG. The order was valid for five years. Bell signed the order, acknowledging receipt.

Five days later, on December 25, 2013, TG called 911 as she was being assaulted by a man at her apartment. The man was not there when police officers arrived. TG identified the man to a responding officer as Bell.

Less than three months later, on March 15, 2014, TG again called 911 from her apartment. She told the operator there was no emergency but she needed help getting Bell out of her apartment. Responding officers found Bell in TG's apartment, arrested him, and took him to jail.

Bell called TG from jail several times on March 15 and 16, 2014.

The State charged Bell with three counts of domestic violence felony violation of a court order. Count 1 corresponds to the December 25 incident, count 2 to the March 15 incident, and count 3 to Bell's phone calls to TG from jail. The State charged two separate aggravating circumstances on all three counts.

Bell's trial occurred in October 2014. Neither Bell nor TG testified. The State played recordings of TG's December 25 911 call and her conversations with responding officers on that day, recordings of Bell being arrested at TG's apartment and taken to jail on March 15, and his phone calls from jail to TG. The State presented testimony from officers who responded to TG's 911 calls on December 25 and March 15. Bell stipulated that he had twice been previously

2

convicted of violating a court order protecting TG. The jury found Bell guilty on all three counts.

After a second phase of the trial, the jury found the two aggravating circumstances. The court imposed an exceptional sentence of 70 months, 10 months above the standard range sentence. Bell appeals.

## CONFRONTATION CLAUSE

The recording of TG's December 25 911 call captures part of the assault as it happened, with TG saying she is bleeding and telling an unidentified male to "back off," "leave me alone," "let go of me," and "I need to breathe." A man's voice is heard on the call. At one point, he says, "Who is it? If it's the police, I'm not opening up. Is it the police? No, I don't open up to police. Police, no. No police come in here." TG tells the operator that the man left and police officers have arrived. The call ends with TG agreeing to go speak to the officers outside.

The officers' body microphones recorded their arrival at TG's apartment complex. The recordings show that as they arrive, one officer sees a man he believes is TG's assailant running down a stairwell in the building. As two officers continue searching for the assailant, Officer Jason Tucker goes to TG's apartment to speak with her.

Bell objected to the admission of TG's recorded conversation to Officer Tucker on the ground that it violated the confrontation clause. The trial court redacted statements TG made to the officer, indicating he had assaulted her before. The part of the recording where she identified Bell by name was not

3

admitted at trial. The court admitted the following portion of the recording of their conversation:

> [Officer Tucker]: Hi, ma'am. What's going on?
> [TG]: Well, he (unintelligible). Came over for the holiday. He came here, was drinking and he's (unintelligible) cheating on me and (unintelligible).
> [Officer Tucker]: Did he beat on you, or . . .
> [TG]: Yeah, yeah. Punching, kicking, saying you're going to die today.
>
>  . . . .
>
> [Officer Tucker]: Do you know where he might be headed right now? Does he have anywhere around here he might go?
> [TG]: He knows everybody around here.

Officer Tucker testified to essentially the same statements from his own recollection of his conversation with TG. A detail added by his testimony was that TG told him the person who beat her up was her "baby's daddy."

Bell argues that the court erred in admitting TG's statements to Officer Tucker. Our review is de novo. State v. Mason, 160 Wn.2d 910, 922, 162 P.3d 396 (2007), cert. denied, 553 U.S. 1035 (2008).

Under the Sixth Amendment, a criminal defendant "shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. The confrontation clause bars the admission of testimonial statements, with certain exceptions not relevant here. Crawford v. Washington, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004).

The United States Supreme Court has adopted the "primary purpose" test to determine whether a statement is testimonial. Under this test, statements are nontestimonial "when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation

is to enable police assistance to meet an ongoing emergency." Davis v. Washington, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006).

The Washington Supreme Court has drawn from Davis four factors to determine whether the "primary purpose" of police interrogation is to enable assistance to meet an ongoing emergency: (1) whether a "reasonable listener" would conclude that the speaker was facing an ongoing emergency that required help; (2) whether the person was speaking about current events as they were actually occurring, requiring police assistance, or describing past events; (3) the nature of what was asked and answered; and (4) the level of formality of the investigation. State v. Koslowski, 166 Wn.2d 409, 418-19, 209 P.3d 479 (2009).

Because this is a domestic violence case, we focus on the threat to TG and assess the ongoing emergency from the perspective of whether there was a continuing threat *to her.* See Michigan v. Bryant, 562 U.S. 344, 363-64, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011). "The critical consideration is not whether the perpetrator is or is not at the scene, but rather whether the perpetrator poses a threat of harm, thereby contributing to an ongoing emergency." State v. Ohlson, 162 Wn.2d 1, 15, 168 P.3d 1273 (2007).

Although TG's assailant was no longer assaulting her, he was at large and likely still in the immediate vicinity, given that he had just left the apartment and TG said he knew "everybody" in the area. His reported statement to TG that "you're going to die today" indicated a continuing threat of harm to her. A reasonable listener would recognize that TG was facing an ongoing emergency. See Ohlson, 162 Wn.2d 1 at 18 (ongoing emergency because there was every

5

reason to believe the assailant might return again and perhaps escalate his behavior). Cf. Davis, 547 U.S. at 819-20 (defendant was still present and officers kept him physically separated from his wife in another room).

TG was speaking about events as they were happening. She was still on the 911 call when officers arrived. The officer's questions were generally designed to assess the current situation and find the assailant. And to the extent the conversation the officer had with TG was investigative, it was not formal. In light of the four factors identified in Davis, the trial court correctly concluded the primary purpose of TG's statements to the officer was to enable the officers to meet an ongoing emergency. TG's statements were nontestimonial, and their admission did not violate Bell's Sixth Amendment right to confrontation.

## VOICE IDENTIFICATION TESTIMONY

Bell moved in limine to exclude witness opinions as to his guilt and officer testimony identifying his voice on the phone calls from jail. At trial, Detective Nicole Freutel testified that she thought the voices on the December 25 911 call "sounded like" TG and Bell. Bell did not object. On appeal, Bell argues that the detective's testimony should have been excluded under ER 701 and State v. George, 150 Wn. App. 110, 206 P.3d 697, review denied, 166 Wn.2d 1037 (2009).

One of the factors to consider in whether to admit lay opinion under ER 701 is whether it is helpful to the jury. A court must also consider the risk of invading the province of the jury and unfairly prejudicing the defendant. George, 150 Wn. App. at 118. For example, in George the admission of an officer's

testimony as to the identity of persons in a surveillance photograph was held to be error. There was no basis for concluding that the officer, who had observed the defendants briefly, knew enough about what they looked like to express an opinion that they were the robbers shown on the very poor quality surveillance video. George, 150 Wn. App. at 119.

Detective Freutel had interviewed TG in person, and her primary function as a witness was to identify TG's voice on the various recordings. She had no independent knowledge of what Bell's voice sounded like. Her basis of knowledge to recognize his voice came from listening to the recordings. Bell argues her testimony was prejudicial and should not have been admitted.

December 25 call

Bell takes particular issue with Detective Freutel's identification of his voice on the 911 call of December 25. Bell did not object when this testimony came in. He argues that his motions in limine preserved his right to raise the issue on appeal. We disagree. The motions in limine did not address the issue of testimony identifying the male voice on the 911 call. Detective Freutel's testimony was not an opinion as to guilt.

Bell contends that he can raise the alleged error for the first time on appeal due to ineffective assistance of counsel and because it constitutes manifest error affecting a constitutional right reviewable under RAP 2.5(a)(3). Claims of ineffective assistance of counsel and manifest error both require the defendant to demonstrate prejudice. See Strickland v. Washington, 466 U.S.

7

668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) (ineffective assistance of counsel); State v. Kirkman, 159 Wn.2d 918, 926-27, 155 P.3d 125 (2007) (manifest error).

Detective Freutel's testimony was not the only evidence that Bell was the assailant in the December 25 incident. Officer Tucker testified that TG identified the man who beat her as her child's father. Bell later stipulated that he and TG had a child together. Another officer saw a man running away down the stairwell of the apartment building who loosely fit the description of Bell given by TG.

Significantly, the jurors heard the man's voice on the 911 call and the phone calls Bell made from jail. They could decide for themselves whether the man's voice from the 911 call was the same. In closing argument, the State invited jurors to compare the recordings for themselves. In light of the other evidence presented that he was the man in the apartment on December 25, Bell has not shown prejudice from the testimony by Detective Freutel.

Jail calls

Bell's motion in limine did request exclusion of officer testimony identifying his voice on the phone calls he made from jail. The court denied the motion. When Detective Freutel testified that she recognized Bell's voice on the phone calls he made from jail, Bell did not renew his objection.

Assuming Bell preserved the objection via the motion in limine, and assuming it was error, reversal is called for only if the error resulted in prejudice to Bell. State v. Howard, 127 Wn. App. 862, 871, 113 P.3d 511 (2005), review denied, 156 Wn.2d 1014 (2006). We apply the rule that "'error is not prejudicial unless, within reasonable probabilities, the outcome of the trial would have been

8

materially affected had the error not occurred.'" Howard, 127 Wn. App. at 871 (internal quotation marks omitted), quoting State v. Bourgeois, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997).

Bell admitted in closing argument that he talked to TG on the phone from jail. His defense was that when he made the calls, he did not know about the no-contact order or he believed that it had expired. Whether it was Bell's voice on the jail calls was not a contested issue. Even without Detective Freutel's testimony, the jury could not have seriously doubted that Bell's was the voice on the phone. We therefore conclude that any error was harmless.

## WASHINGTON PRIVACY ACT

When police responded to TG's 911 call on March 15, 2014, they were wearing body microphones that corresponded to video cameras mounted in their patrol car. The equipment made three separate but overlapping recordings of the officers' interactions with Bell as he was arrested, put into a police car, and transported to jail. Bell's behavior and comments on the recordings showed him in a poor light. The recordings were played at trial, over Bell's objection that their admission violated the Washington privacy act, chapter RCW 9.73. Bell contends the recordings were prejudicial because they showed him handcuffed and restrained and behaving obnoxiously, and also because excluding them would have eliminated one of the points of comparison that supported identification of his voice on the 911 call on December 25.

Information obtained in violation of RCW 9.73.030-.040 is generally inadmissible. RCW 9.73.050. The act makes an exception for police and other emergency personnel in certain situations. RCW 9.73.090(1).

Two subsections of RCW 9.73.090(1) are pertinent here. Subsection (b) governs video and sound recordings "made of *arrested persons* by police officers responsible for making arrests or holding persons in custody before their first appearance in court." RCW 9.73.090(1)(b) (emphasis added). For a recording to be admissible under this subsection, which our Supreme Court has referred to as the "custodial interrogation proviso," the arrested person must be fully informed on the recording of his constitutional rights. RCW 9.73.090(1)(b)(iii); Lewis v. Dep't of Licensing, 157 Wn.2d 446, 467, 139 P.3d 1078 (2006).

Subsection (c) governs "sound recordings that correspond to video images recorded by video cameras mounted in law enforcement vehicles." RCW 9.73.090(1)(c). This subsection was added in 2000. The Supreme Court has referred to it as the "traffic stop proviso." Lewis, 157 Wn.2d at 467. When a sound recording of a person is made under subsection (c), the person must be informed on the recording that a sound recording is being made, but there is no requirement for advice of constitutional rights.

Bell argues that subsection (b) applies in his case. If so, it was error to admit the recordings of Bell because he was not informed of his constitutional rights on the recording. The State responds that subsection (c) applies.

It is undisputed that the recordings of Bell correspond to video images recorded by cameras mounted in the patrol cars. Subsection (c) governs this

specific and narrow category of recordings. But it is also undisputed that Bell was arrested shortly after the first recording began. Because he was an "arrested person" after that point, arguably the recording from then on falls under the plain language of subsection (b). And even if the recordings fall under subsection (c), Bell has an argument that the third recording contains no statement informing Bell that he was being recorded.

We need not resolve these issues, however, because even if the recordings of Bell were admitted in error, the error was harmless. Admission of evidence in violation of the Washington Privacy Act is not a constitutional violation. State v. Cunningham, 93 Wn.2d 823, 831, 613 P.2d 1139 (1980). Error is not prejudicial unless, within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected. Cunningham, 93 Wn.2d at 831.

To convict Bell of felony violation of a court order on March 15, 2014, the State had to prove that a no-contact order applicable to Bell existed on that date, that Bell knew the order existed and knowingly violated it, and that, in relevant part, he had twice been previously convicted for violating the provisions of a court order. See RCW 26.50.110(1). The State's evidence decisively established every element of the crime without the recordings.

Even if the recordings were inadmissible, the responding officers were still allowed to testify about what they saw and heard. The strict exclusion remedy of State v. Fjermestad, 114 Wn.2d 828, 836, 791 P.2d 897 (1990), does not apply. When the interactions captured on the recording are not private conversations,

the recordings are inadmissible, but the court may admit "other evidence acquired at the same time as the improper recordings, such as the officer's simultaneous visual observations." Lewis, 157 Wn.2d at 472. Bell does not argue that his interactions with the officers on March 15 were private conversations.

The officers testified that Bell was defiant, verbally combative, offered to pay officers three million dollars to let him go, and urinated on himself. Since the recordings were generally cumulative of the officers' properly admitted testimony, Bell has not shown that the outcome of the trial was materially affected by the unattractive light in which the recordings portrayed him.

It is true that exclusion of the audio recordings of the arrest on March 15 would have eliminated them as one basis for comparison that allowed Detective Freutel and the jury to identify Bell's voice on the recording of the 911 call in the first count. But Bell's five lengthy phone calls to TG from jail on the day of his arrest and the next day would have remained as a strong foundation for identifying Bell's voice. We conclude the outcome of the trial would not have been materially affected if the challenged recordings had been excluded.

## PUBLIC TRIAL RIGHT

The court granted a motion in limine to prevent the State's witnesses from mentioning that Bell had warrants. During an officer's direct testimony, the State played a recording of Bell's arrest on March 15. On the recording, an officer is heard to say, "You're under arrest at this point. You've got a couple warrants and you're violating an order" and later "go ahead and verify this warrant." At the

end of the officer's direct testimony, defense counsel stated that he had a motion. The court heard the motion at a sidebar off the record. At the end of the officer's cross-examination, the court called for another sidebar, again conducted off the record. Immediately after the second sidebar, the court instructed the jury to disregard any references to whether Bell had any warrants.

After a short recess, the court reconvened without the jury. Both sidebars were put on the record. The court and the parties agreed that at the first sidebar Bell moved for a mistrial and argued that the references to his warrants in the recording violated the ruling in limine. The court denied the mistrial motion but offered to give a limiting instruction. The court called the second sidebar to ask Bell whether he actually wanted the court to give a limiting instruction, and Bell said yes.

Bell contends that the trial court violated his right to a public trial by conducting the two sidebars off the record. An alleged violation of the right to a public trial presents a question of law that we review de novo. State v. Smith, 181 Wn.2d 508, 513, 334 P.3d 1049 (2014). Whether the proceeding at issue implicates the public trial right calls for the application of the "experience and logic" test. Smith, 181 Wn.2d at 514.

Sidebars on evidentiary objections during trial generally do not implicate the public trial right. Smith, 181 Wn.2d at 519. The Smith court cautioned that to avoid implicating the public trial right, sidebars must be limited in content to their traditional subject areas, must be done only to avoid disrupting the flow of trial,

13

and must be conducted either on the record or promptly memorialized on the record. Smith, 181 Wn.2d at 516 n.10.

The purpose of the sidebars here was to address Bell's evidentiary objection, a traditional subject area. See Smith, 181 Wn.2d at 518. Both sidebars were conducted to avoid disrupting the flow of the officer's testimony and the trial as a whole. Both sidebars were promptly memorialized on the record, so the public was not prevented from knowing what occurred. See Smith, 181 Wn.2d at 518.

Bell argues that the sidebars implicate the public trial right because he requested a mistrial. He cites State v. Burdette, 178 Wn. App. 183, 313 P.3d 1235 (2013). In Burdette, the jury reported soon after beginning deliberations that it was deadlocked over several issues. After consulting with counsel, the trial court sent the jury a response asking them to continue deliberations. The record did not reflect where any discussions about the trial court's responses were held. Burdette, 178 Wn. App. at 189. On appeal, the defendant argued unsuccessfully that the court violated his public trial right by not discussing its responses to the jury communications in open court. Burdette, 178 Wn. App. at 189-90, 193.

The Burdette court reasoned that the trial court did not consider the jury's statement to be a genuine statement of hopeless deadlock, which would trigger consideration of a mistrial. Burdette, 178 Wn. App. at 196. The court opined, in dicta, that when a trial court considers declaring a mistrial on the basis that a jury is hopelessly deadlocked, a decision that has constitutional dimensions because

14

of double jeopardy implications, both prongs of the logic and experience test indicate that the public trial right would attach. Burdette, 178 Wn. App. at 196.

Burdette should not be understood as a blanket statement that all mistrial motions must be considered on the record. If that were so, no routine evidentiary objection accompanied by a motion for a mistrial could be handled in a sidebar, thus evading the rule of Smith that an evidentiary objection is a traditional subject area for a sidebar. The commentary in Burdette should be recognized as limited to the context of dealing with deadlocked juries.

The sidebars here were held to consider a routine evidentiary issue with no constitutional dimension. They were analogous to the sidebars in Smith and did not implicate the public trial right. We conclude Bell's right to a public trial was not violated.

## CUMULATIVE ERROR

Bell moved the trial court for a mistrial based on cumulative error at least twice, based on a number of irregularities that occurred during the trial. The trial court denied both motions. Bell assigns error to that ruling. Our review is for abuse of discretion. State v. Emery, 174 Wn.2d 741, 765, 278 P.3d 653 (2012).

To determine the effect of a trial irregularity, the court considers (1) the seriousness, (2) whether it was cumulative of other properly admitted evidence, and (3) whether the irregularity could be cured by an instruction to disregard the remark, an instruction the jury is presumed to follow. State v. Escalona, 49 Wn. App. 251, 254-55, 742 P.2d 190 (1987).

First, Bell alleges prejudice from testimony that violated an order in limine prohibiting reference to Bell's prior bad acts. Officers testified that TG's apartment "had a lot of history at it," that Bell had a previous booking photo, and that TG said "it had happened before." The trial court struck the first two statements. On the March 15 recording of Bell's arrest and transport to jail, an officer referred to warrants out for Bell and Bell said to officers, "I know I got to deal with DOC." The trial court instructed the jury to disregard mention of any warrants out for Bell.

The vague references to Bell's prior arrests or convictions were cumulative of properly admitted evidence. Bell stipulated that he had twice been previously convicted for violating a court order protecting TG. The court either struck, redacted, or gave a limiting instruction regarding most of the testimony. We presume the jury followed these instructions and conclude they cured any prejudice.

The next irregularity concerns one of the calls Bell made to TG from jail. He told her, "You're going to burn in hell. (Unintelligible) sitting here month after month because of your fucking hell ass lies." The phrase "month after month" was supposed to have been redacted from the recording played to the jury in order to remove the implication that Bell was deemed dangerous enough to be kept in jail for months. This was not a serious irregularity. A reasonable juror listening to the phone calls would have realized that Bell expected to be bailed out within a few days and was exaggerating to make TG feel guilty.

16

Last, Bell alleges error based on juror misconduct. The trial court described the misconduct on the record. After the court read Bell's stipulation that he had two prior convictions for violation of a court order protecting TG, juror 4 approached the bailiff in the jury room. He told the bailiff that he did not understand the stipulation. The bailiff told him that she could not talk to him about it. The juror asked the bailiff if the stipulation meant that Bell already admitted he was guilty. The bailiff repeated that she could not talk to him. Juror 4 then turned to the other jurors and asked them if they thought that's what the stipulation meant. The other jurors all stared at him, "presumably understanding they can't talk about it." The bailiff said that they could not talk about the case. Juror 4 said that he wanted to talk to the judge. When he saw the judge on the bench as the jurors were leaving, he again said that he wanted to talk to the court about the stipulation. When Bell heard the court's account of what had happened, he moved for a mistrial.

The court excused juror 4 from the jury. The court brought in all the other jurors and questioned them at length. The court then denied the motion for a mistrial, finding that there was not sufficient evidence to indicate that the jury was tainted. The court reconsidered Bell's motion after closing arguments and again denied it because the closing arguments made clear that Bell's stipulation was not an admission of guilt.

We agree with the trial court that there was insufficient evidence that the jury was tainted. The trial court dismissed juror 4 and inquired adequately to

ensure that the rest of the jurors had not been tainted. We find no abuse of discretion.

Separately, Bell argues that the cumulative effect of the errors he has raised on appeal—the confrontation clause issue, the sidebar issue, the privacy act issue and the voice identification issue—deprived him of a fair trial. We reject this argument. As detailed above, we conclude as to most issues there was no error, and if there was error, no prejudice.

## EXCEPTIONAL SENTENCE

The jury found that all three counts were aggravated by an ongoing pattern of abuse. See RCW 9.94A.535(3)(h)(i) (the offense "was part of an ongoing pattern of psychological, physical, or sexual abuse of a victim or multiple victims manifested by multiple incidents over a prolonged period of time"). The jury also found that count 1, for the incident on December 25, was also aggravated by rapid recidivism. See RCW 9.94A.535(3)(t) (jury may decide alleged aggravating factor that the defendant "committed the current offense shortly after being released from incarceration.")

The jury was given the pattern instruction regarding the aggravating factor of an ongoing pattern of abuse. The pattern instruction was recently disapproved because it erroneously included language defining the term "prolonged period of time" to mean "more than a few weeks." State v. Brush, 183 Wn.2d 550, 559, 353 P.3d 213 (2015). As a remedy for use of the erroneous instruction, Bell requests that we vacate his exceptional sentence and remand for resentencing.

18

At sentencing, the trial court entered a conclusion of law that: "Each one of these aggravating circumstances is a substantial and compelling reason, standing alone, that is sufficient justification for the length of the exceptional sentence imposed. In the event that an appellate court affirms at least one of the substantial and compelling reasons, the length of the sentence should remain the same." On the judgment and sentence, the trial court checked a box stating "the court would impose the same sentence on the basis of any one of the aggravating circumstances."

An exceptional sentence may be upheld on appeal even when all but one of the trial court's reasons for the sentence have been overturned. State v. Gaines, 122 Wn.2d 502, 512, 859 P.2d 36 (1993). Remand for resentencing is necessary only if it is not clear that the trial court would have imposed an exceptional sentence on the basis of only the one factor upheld. Gaines, 122 Wn.2d at 512.

Bell does not challenge the aggravating circumstance of rapid recidivism. It remains valid. Bell contends resentencing is necessary because the exceptional sentence was imposed only on count 3, while the valid aggravator of rapid recidivism applied only to count 1. He is mistaken. The exceptional sentence was not particularized to count 3.

Ordinarily, the sentences on all three counts would have been concurrent, RCW 9.94A.589(1)(a), but a court may run such sentences consecutively when there are grounds for an exceptional sentence. See RCW 9.94A.535. The court sentenced Bell to the maximum term of 60 months each on counts 1 and 2, to be

19

served concurrently, and 10 months on count 3, to be served consecutively. Bell's sentence is exceptional because the sentence on count 3 was made consecutive to the other counts, but this does not mean the exceptional sentence was imposed only on count 3. The court could have (and stated it would have) done the same thing even if there had been no finding of an ongoing pattern of abuse.

By making the sentence on count 3 consecutive, the trial court achieved a modest increase of 10 months over the presumptive standard range sentence for the three counts. Cf. State v. Smith, 123 Wn.2d 51, 864 P.2d 1371 (1993) (where exceptional sentence exceeded standard sentence by almost six times, it was unclear whether trial court would have imposed the same sentence if it had only considered the valid aggravating factors).

Remanding for resentencing is unnecessary because the trial court made clear that it would have imposed the same exceptional sentence on the basis of the rapid recidivism aggravating circumstance alone.

DISMISSAL OF FEBRUARY 10, 2014, CHARGE

The State initially charged Bell with a fourth count of domestic violence felony violation of a court order, arising from an incident on February 10, 2014. After the State rested its case-in-chief, Bell moved to dismiss this count because the State had not presented any evidence. The State did not object, and the court dismissed the February 10 count. Two days later, the State filed a fourth and final amended information omitting this count.

20

Bell requests that we remand to the trial court for amendment of the judgment and sentence to reflect the dismissal of the February 10 count or, alternatively, entry of an order dismissing it. He does not cite authority to support the need to amend a sentence that is neither erroneous nor illegal. We deny the request to remand for written dismissal of the charge.

## CLERICAL ERROR IN JUDGMENT AND SENTENCE

Both parties agree that the judgment and sentence erroneously lists count 2 as having been committed on February 10, 2014, instead of March 15, 2014, the correct date. We remand to the trial court for correction of this clerical error. See, e.g., CrR 7.8 (clerical mistakes in judgments may be corrected by the court at any time); In re Pers. Restraint of Mayer, 128 Wn. App. 694, 701-02, 708, 117 P.3d 353 (2005) (remanding to trial court for correction of statutory citation clerical error in judgment and sentence).

Affirmed. We remand solely for correction of the clerical error in the judgment and sentence.

Becker, J.

WE CONCUR:

Trickey, J