[No. 46606. En Banc. July 3, 1980.]

THE STATE OF WASHINGTON, *Petitioner,* v. EDWARD LEON CUNNINGHAM, ET AL, *Respondents.*

824

*Jeffrey C. Sullivan, Prosecuting Attorney,* and *Robert N. Hackett, Jr., Deputy,* for petitioner.

*David H. Putney* (of *Halverson, Applegate & McDonald*), *Wiley G. Hurst* (of *Elofson, Vincent, Hurst, Crossland & Menke*), *Paul M. Larson* (of *Brooks & Larson*), *Russell J. Mazzola* (of *Smith, Scott & Mazzola*), and *Wade E. Gano* (of *Thorner, Kennedy & Gano*), for respondents.

STAFFORD, J.—The State has petitioned for review of the Court of Appeals decision reported in 23 Wn. App. 826, 598 P.2d 756 (1979). We reverse and remand the cause to the Court of Appeals for disposition in accordance with this opinion.

Leon Cunningham, his wife Velma and daughter Carolyn shared their home with Lorraine Edwards, Debbie Weilbacher and her 3–year–old son David. In April of 1976, Leon, a self–ordained minister and head of the communal household, began to suspect David was possessed by the devil. Accordingly, from April until late July 1976 the entire household engaged in an almost daily exorcism ritual of spanking David to rid him of his evil spirit.[1] Wooden boards were sanded and used to spank David as he was

---

[1]The exorcistic services were based upon a biblical aphorism "You may beat the child and he will not die" which stems from Proverbs 23:13–14 (New World Translation of the Holy Scriptures): "Do not hold back discipline from the mere boy. In case you beat him with the rod, he will not die. . . . With the rod you yourself should beat him, that you may deliver his very soul from She'ol itself."

passed from person to person during the service. On occasion, Leon and Debbie would "humble" David by repeatedly pushing him to the floor. There is evidence that during the "humbling" ritual on July 22, 1976, David was thrown to the floor and thereafter collapsed and ceased breathing. Since defendants believed that, in the course of time, God would resurrect David's body, it was placed in a back bedroom which was then sealed.

Approximately 2 months later, Velma Cunningham reported the series of incidents to the authorities. A warrant was issued and, on September 19, 1976, a search of the Cunningham residence revealed David's body.

Leon, Velma and Carolyn Cunningham as well as Debbie Weilbacher and Lorraine Edwards were charged with first-degree manslaughter and second-degree assault. The jury found all five guilty of second-degree assault. Debbie Weilbacher, Leon and Carolyn Cunningham were also found guilty of first-degree manslaughter; Velma Cunningham and Lorraine Edwards were also found guilty of second-degree manslaughter. Judgment and sentence were entered accordingly, and all defendants except Debbie Weilbacher appealed.[2] The Court of Appeals reversed the trial court and remanded the consolidated cases for new trial.[3]

---

[2] Debbie Weilbacher withdrew her appeal May 22, 1978.

[3] On appeal, the Court of Appeals ruled defendants' convictions for both assault and manslaughter violated the proscription against double jeopardy. At trial, each defendant was charged with one count of first-degree manslaughter for having recklessly caused David's death and one count of second-degree assault. Defendants urged the trial court to submit interrogatories and appropriate instructions to the jury requiring them to specify the date of the alleged assault as well as the specific cause of death. It was argued that the act of spanking could constitute the cause of death as well as the alleged assault. Further, it was argued, that if the cause of death was the "humbling" rather than the spankings, then only *some* of the defendants would be guilty of manslaughter because not all had participated in the final "humbling" episode.

The trial court refused to submit the requested interrogatories. Thereafter the jury returned general guilty verdicts on the charges of manslaughter and assault and the trial court entered judgments on *both*. On appeal, defendants contend the alleged assaults were the bases for both the charge of first-degree manslaughter

The State's petition for review challenges the Court of Appeals opinion regarding: (1) the admission into evidence and playing of Leon and Carolyn Cunninghams' taped statements; (2) the use of typed transcripts of the Leon and Carolyn Cunningham tapes as listening aids for the jury; (3) asserted prejudice to defendants Velma Cunningham and Lorraine Edwards by the admission and playing of the taped statements of codefendants Leon and Carolyn Cunningham; and (4) the trial court's failure to sequester the jury.

## I
### TAPED STATEMENT OF LEON AND CAROLYN CUNNINGHAM
#### A. *Admissibility*

At the time of arrest recorded statements regarding the events in the Cunningham home were taken from each defendant by Sergeant Langdale, a detective in the Yakima County Sheriff's Office. Prior to recording the individual statements, defendants were informed they were not required to speak, but if they did the statements would be used against them in court. Defendants do not challenge the voluntariness of their recorded statements.

---

and second–degree assault. Thus, they argue, the multiple convictions violate both the federal and state constitutional prohibitions against double jeopardy.

The Court of Appeals held that since the conviction and sentencing on both the manslaughter and assault charges occurred without clarifying interrogatories, the constitutional prohibition against double jeopardy was violated. It held further: "[t]he entry of judgment on the verdict for the assault must be and is vacated, as it cannot be said not to have merged in the finding of guilt of the greater offense of manslaughter. Ordinarily, the appropriate remedy is to set aside the conviction and sentence on the lesser offense, which would be the assault in this case. . . . Due, however, to other error in the record, the entire case must be remanded for new trial." *State v. Cunningham*, 23 Wn. App. 826, 863, 598 P.2d 756 (1979).

The State does not challenge the court's disposition of the double jeopardy issue or its statement that the "appropriate remedy is to set aside the conviction and sentence on the lesser offense, which would be the assault in this case." *State v. Cunningham, supra* at 863. Since no error has been assigned to the court's ruling and the State has presented no argument, we express no opinion thereon. *See* RAP 10.3(g).

At trial, the tapes of Leon and Carolyn Cunningham were played for the jury. The Court of Appeals held that the tapes did not strictly conform to the statutory requirements of RCW 9.73.010 *et seq.,* and thus were inadmissible. We agree.

The State seems to argue that within the purview of RCW 9.73.030(2)[4] it is of no consequence whether the recorded statements were "private" in nature because defendants Leon and Carolyn Cunningham gave prior "consent" to the recordings, thus satisfying RCW 9.73-.030(2). This, it is suggested, makes it unnecessary for further compliance with RCW 9.73.090(2) set forth below. We do not agree. This contention is an oversimplification of the statutory mandate of RCW 9.73.030(2). More than mere prior "consent" is required to comply with the protection accorded "arrested persons" under RCW 9.73.090(2).

 Even a cursory reading makes it clear that, except as provided elsewhere in RCW 9.73, RCW 9.73.030(2) generally applies to *all people.* In its overall application to the general public, consent is the touchstone for unhampered use of recorded conversations. RCW 9.73.090, however, is one of the exceptions "otherwise provided" for in RCW 9.73.030. RCW 9.73.090(2) (since amended by Laws of 1977, 1st Ex. Sess., ch. 363, § 3) provides in pertinent part:

The provisions of RCW 9.73.030 through 9.73.080 shall not apply to police and fire personnel in the following instances:

. . .

(2) Video and/or sound recordings may be made of *arrested persons* by police officers responsible for making

---

[4]RCW 9.73.030(2) (since amended by Laws of 1977, 1st Ex. Sess., ch. 363, § 1) provides in pertinent part:

"Except as otherwise provided in this chapter, it shall be *unlawful* for any individual, partnership, corporation, association, or the state of Washington, its agencies, and political subdivisions *to* intercept, *record* or divulge any:

". . .

"(2) *Private conversation,* by any device electronic or otherwise designed to record or transmit such conversation regardless how the device is powered or actuated *without first obtaining* the *consent* of all the persons engaged in the conversation." (Italics ours.)

arrests or holding persons in custody before their first appearance in court. Such video and/or sound recordings *shall conform strictly to the following*:

(a) *the arrested person shall be informed* that *such recording is being made and the statement* so informing him *shall be included in the recording,*

(b) the *recording shall commence with an indication of the time of the beginning* thereof *and terminate with an indication of the time* thereof,

(c) *at the commencement of the recording the arrested person shall be fully informed of his constitutional rights,* and *such statements* informing him *shall be included in the recording,*

(d) the recordings shall only be used for valid police or court activities.

(Italics ours.)

Insofar as we are here concerned, RCW 9.73.090 is specifically aimed at the specialized activity of police taking recorded statements from arrested persons, as distinguished from the general public. While mere consent may be wholly sufficient to protect members of the general public whose statements have been recorded under noncustodial conditions, such is not true when dealing with persons whose statements have been taken while under custodial arrest. In the latter situation, consent alone has been deemed insufficient. The legislature has authorized police to make sound recordings of statements made by arrested persons only under carefully circumscribed conditions. The recordings are required to "conform strictly" to rules which ensure that waiver by consent authorized by RCW 9.73.030 is capable of proof by the recording itself thereby avoiding a "swearing contest".

The foregoing statutory provisions, when adhered to strictly, will establish within the recording itself that a defendant's consent was given only after being informed the statement would be recorded; that the consent and resultant statement were given only after being fully informed of one's constitutional rights, including the exact information imparted; and that the statement was not obtained by means of oppressively long interrogation or

interrogation that occurred at unreasonable times or in unreasonable sequences. In short, while RCW 9.73.030 authorizes the use of a recorded statement obtained after the prior consent of all persons engaged therein, RCW 9.73.090(2) controls the nature and means of obtaining that consent. The two statutory provisions are interrelated parts of a single statutory scheme.

■ At trial, Leon and Carolyn Cunningham repeatedly objected to the admission of their tapes. They asserted the requirements of RCW 9.73.090(2) had not been met because the starting time and full statement of constitutional rights were not included in each tape. The trial court overruled the objections, concluding there had been "strict compliance" with RCW 9.73.090(2) because the recorded statements made reference to a previously signed statement of constitutional rights which, in turn, noted the time of beginning and ending of the interrogation.[5] We do not agree.

The trial court failed to follow the clear language of RCW 9.73.090(2) requiring that the statement of constitutional rights and indication of the time the recordings began and ended be included in the recordings themselves. It is impossible to rely only on the recordings, as required by statute. One must glean the mandated information from

---

[5]"The Court: The court's ruling is that the furnishing of the reference in the beginning of the tape to the *previously signed constitutional rights* is strict compliance with the statute . . . because the statute is designed to provide a means in the tape itself for a listener to determine that the person giving the statement has had an opportunity to consider the constitutional rights that apply to that situation and to take appropriate action. The facts in this case, while they do not indicate that the statement–taker conformed to the strict words of the statute, still did comply with the requirement of the statute that the person giving the statement have an opportunity to make a conscious decision about his constitutional rights. The time of starting and stopping is also supplied by the *written evidence of the waiver of the constitutional rights*. It is for that reason . . . that I admitted the tapes in the light of the statute. The tapes, of course, were admitted for reasons other than the statute. The statute is a limiting statute, not an authorizing statute." (Italics ours.)

secondary or extrinsic evidence. Consequently, the recordings do not "conform strictly" to the statute and accordingly the Leon and Carolyn Cunningham tapes were inadmissible.

## B. *Harmless Error*

The inadmissibility of the Leon and Carolyn Cunningham tapes does not resolve the question of the propriety of their use in the instant case. We must consider whether use of the inadmissible tapes was reversible error under the circumstances.

First, we note an accused cannot avail himself of error as a ground for reversal unless it has been prejudicial. *State v. Rogers,* 83 Wn.2d 553, 520 P.2d 159 (1974); *State v. Martin,* 73 Wn.2d 616, 627, 440 P.2d 429 (1968); *State v. White,* 72 Wn.2d 524, 433 P.2d 682 (1967). Next, it must be observed that admission of the tapes was not a violation of constitutional proportions. It was a statutory violation. Accordingly, the stringent standard of proving "harmless error beyond a reasonable doubt" is inapplicable. *State v. Nist,* 77 Wn.2d 227, 461 P.2d 322 (1969). We apply instead the rule that error is not prejudicial unless, within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected. *State v. Rogers, supra; State v. Craig,* 82 Wn.2d 777, 514 P.2d 151 (1973); *State v. Schrager,* 74 Wn.2d 75, 442 P.2d 1004 (1968); *State v. Britton,* 27 Wn.2d 336, 178 P.2d 341 (1947).

After a review of the entire record, we are convinced the outcome of the trial would not have been affected had the challenged tapes been excluded. Wholly independent of Leon and Carolyn's tapes, the jury could have reached no other rational conclusion than that defendants Leon and Carolyn Cunningham were guilty as charged. Not only does the trial record make it clear David was assaulted by all adult members of the "family", including Leon and Carolyn Cunningham, but that he died on July 22, 1976, from multiple episodes of physical abuse, the most immediate or

probable cause of death being a chronic subdural hematoma.

The use of the tapes was harmless error for another reason. The defenses of Leon and Carolyn Cunningham did not vary significantly from the information contained in their challenged tapes: neither disputed the almost daily spankings with wooden paddles or boards and neither disputed their use by all the adults at one time or another. Neither challenged other testimony of the repeated "humbling" ritual which allegedly culminated in David's death after he was thrown or dropped on the floor. Indeed, both defendants seem to adopt the import of their taped statements as the truth of the matters contained therein. The objections, if any, appear to be directed to the fear the jury might not understand that the spankings and "humbling" were for David's own good, to rid him of a devil that possessed him; as well as the spiritual overtones of whether David was only physically dead but still alive religiously, his body subject to resurrection by God.

■ Finally, Leon does not challenge the correctness of the tapes of his statement. Rather, he sought to use them by way of defense in argument to the jury. He said:

> I'd like to first explain to you why I haven't gotten on the witness stand. I was given an opportunity to tell the truth, and that's what I did with my statement, and that's what I did with the tapes you heard and if I'd a got on the witness stand, why it'd just have been another repeat over and over of what actually happened. *It seems the truth has been brought out over and over and I didn't see anything that I could tell or add to what I'd already brought forth in my statement, what you heard on the tapes,* which are the same which I'm speaking . . .
> . . . I see the confusion even in my statement, where *I was allowed to, I profess, ladies and gentlemen, I was allowed to set down and tell exactly what I seen, what I felt and what happened, and it was the truth. That's what I brought forth in my statement, of exactly what happened and my feelings.*

(Italics ours.) Having utilized the challenged tapes in his own behalf, Leon Cunningham cannot claim prejudicial

error in their admission. *State v. McDonald,* 89 Wn.2d 256, 571 P.2d 930 (1977).

Moreover, as Carolyn Cunningham stated in her cross–examination by Leon:

A. Well, when they brought us in to question us we didn't feel—we wanted to tell the truth and we wasn't afraid of anything that happened or tried to hide anything that had happened, and we were just being open and honest, and when they asked us the questions we didn't—we just answered them as we seen it at that time or that moment.

Q. I mean, it was in your total desire to tell the truth exactly what happened?

A. Right.

Without question Carolyn's trial testimony varied to some extent from that of her challenged tape. Most of the variations dealt, however, with her further explanation of the religious overtones of the spankings and "humbling". This, together with her religious belief that David is still "alive" subject to "resurrection" by God, are hardly relevant to establish reversible error. In her argument to the jury, Carolyn summed up her defense stating:

I realize that this has been based mainly on a religious basis and religious belief, but each individual in this country is entitled to his or her faith and belief, and each according to their own convictions. We in our household, believes that one lives as one believes.

While it was error to have admitted the Leon and Carolyn Cunningham tapes, we hold the error was not prejudicial and thus not reversible.

## II
### Transcripts of the Tapes

Some parts of the taped statements were unclear because of defendants' dialects and some parts were inaudible when played over the court's sound system. Consequently, the prosecution prepared typed transcripts for the jury to use as listening aids. All defendants objected to the first set of transcripts because they were inaccurate. That set was

withdrawn and thereafter the prosecuting attorney prepared a second set.

Velma Cunningham agreed to the admission of her tape and to the use of the transcript and no error is claimed on appeal. Neither Lorraine Edwards' tape nor its transcript was used at trial. Sergeant Langdale testified, without objection, about her statements and no assignment of error was made on appeal. Accordingly, the issue of the typed transcripts is confined to the cases of Leon and Carolyn.

The trial judge informed the jury that the transcripts were not evidence and would be used only as aids for listening to the tapes. The transcripts were so used and were collected after each tape was played. They did not go to the jury room during the deliberations. Since the transcripts were not admitted in evidence and were not used for illustrative purposes as exhibits, the primary issue is whether the trial court committed error by permitting their use solely as listening aids. A secondary issue is, assuming error, whether the error was prejudicial, thus requiring a new trial.

The Court of Appeals reversed the trial court on two grounds. First, since the tapes had been deemed inadmissible, the transcripts were likewise inadmissible. Second, the transcripts should not have been employed as listening aids in the absence of authentication either by stipulation or by proof of accuracy.

The first ground for reversal proceeds on the incorrect assumption that the tapes from which the transcripts were made were in fact inadmissible. As we pointed out in section I, while the trial court committed error by admitting the Leon and Carolyn tapes, the error was harmless and thus not reversible. The transcripts made of those tapes would, of course, stand on the same footing.

■ The second ground for reversal raises a different problem. Concerning the use of transcripts of tapes as jury listening aids, the court in *United States v. Turner,* 528 F.2d 143, 167–68 (9th Cir. 1975), *cert. denied,* 423 U.S. 996, 46 L. Ed. 2d 371, 96 S. Ct. 426 (1976) stated:

It is well recognized that *accurate* typewritten transcripts of sound recordings, used contemporaneously with the introduction of the recordings into evidence, are admissible to assist the jury in following the recordings while they are being played. . . . The admission of such transcripts as an aid in listening to tape recordings . . . is a matter committed to the sound discretion of the trial court.

(Italics ours.) *See also State v. Forrester,* 21 Wn. App. 855, 865, 587 P.2d 179 (1978).

As in *Turner,* the trial court in the instant case permitted the taped transcripts to be used as listening aids only while the tapes were played. Unlike *Turner,* however, the transcripts were not authenticated either by stipulation or proof of accuracy.

We agree with the Court of Appeals that the trial court erred by failing to properly assure the accuracy of the transcripts. The time constraints of trial are not an adequate reason for failing to do so. Nevertheless, the ultimate question is whether the error was in fact prejudicial. We hold it was not.

Although the trial court failed to ascertain the accuracy of the transcripts, the prejudicial effect of the error, if any, depends upon whether the transcripts were actually accurate. If they were in fact accurate, the technical error of employing them as listening aids, without prior assurance of accuracy, is harmless.

We have listened to the tapes with great care and have compared them with the challenged transcripts. With but very few exceedingly insignificant mistakes, on irrelevant matters, the transcripts are accurate reproductions of the tapes. The defendants have demonstrated nothing to the contrary. Further, there is no material difference between the transcripts and the other evidence presented in the case. We conclude the error is not prejudicial and thus is harmless.

## III
### Prejudice of Velma Cunningham and Lorraine Edwards

■ The Court of Appeals, acting sua sponte, held that "although . . . Velma Cunningham did not move to exclude her tape from evidence, she and Lorraine Edwards were prejudiced by their codefendants' taped statements which were improperly admitted." The record fails to disclose, however, that either defendant objected to the playing of her codefendants' taped statements. The record also fails to disclose that either defendant contended she was prejudiced by the use of the codefendants' tapes. Issues not raised in the trial court will not be considered for the first time on appeal. *State v. Wicke,* 91 Wn.2d 638, 642–43, 591 P.2d 452 (1979). Moreover, the appellate briefs of Velma Cunningham and Lorraine Edwards neither assign error nor contain any argument on the above noted holding of the Court of Appeals. An "appellate court will only review a claimed error which is included in an assignment of error or clearly disclosed in the associated issue pertaining thereto." RAP 10.3(g). Here, no error was claimed, none was assigned and none was argued pursuant to RAP 10.3(a)(5). There was nothing for an appellate court to review or upon which to rule. The Court of Appeals claimed error is not well taken.

## IV
### Unsequestered Jury

The Court of Appeals discussed the unsequestered jury issue at length. The question was left unresolved, however, because its rulings on the evidentiary issues made it appear unnecessary to decide the matter. Since we have now reversed the Court of Appeals on the evidentiary matters, the subject of jury sequestration becomes critical insofar as it impinges upon the question of new trial.

The trial was the subject of massive publicity. At the omnibus hearing, defendants moved unsuccessfully to have

the jury sequestered pursuant to CrR 6.7.[6] The intensity of the news media coverage increased dramatically and peaked after the jury was selected and the trial began.

The Yakima Herald Republic followed the case closely on a daily basis. Detailed headlined accounts of the trial, complete with pictures of the defendants, frequently appeared on the front page. During the trial the local paper indicated its intent to publish a baby picture of David. At that point defendants renewed their motion to sequester the jury and were joined therein by the prosecution. The motion was denied and the jury remained unsequestered until deliberation began.

It should be noted that the trial judge did poll the jurors individually to determine whether any had been exposed to publicity. One juror stated she had seen some pictures on the front page of a paper located in the news vending machine in front of the courthouse. She had read nothing and had recognized only one picture, *i.e.*, one previously seen in court. An alternate juror admitted having watched television, but said he had not watched the news. Both the juror and alternate juror maintained they had not been influenced by the publicity. The record appears to indicate that these matters were not disclosed to any of the other jurors.

■ While a trial judge has broad discretion in deciding whether to sequester a jury, the unique facts of this case make it necessary to determine whether the trial court abused the discretion granted it by CrR 6.7. In reviewing the Court of Appeals we are generally limited to questions presented to and determined by that court and to claims of error directed to that court's resolution of such issues. *Peoples Nat'l Bank v. Peterson,* 82 Wn.2d 822, 830, 514 P.2d 159 (1973); *Wood v. Postelthwaite,* 82 Wn.2d 387, 510 P.2d

---

[6]CrR 6.7 provides: "The jury may be allowed to separate if the court finds that good reason exists to believe that such would not jeopardize a fair trial. Any motions or proceedings concerning the separation of the jury shall be made out of the presence of the jury."

1109 (1973). In the instant case, however, the question was presented to the Court of Appeals, was discussed by it, but was left unresolved.

The cause is therefore remanded to the Court of Appeals to determine whether, in light of the news media coverage, the trial court committed error by refusing to sequester the jury and whether, in light of its determination, a new trial should be granted.

UTTER, C.J., and ROSELLINI, WRIGHT, BRACHTENBACH, HOROWITZ, DOLLIVER, HICKS, and WILLIAMS, JJ., concur.