**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 82039-7-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| KRISTEN NICOLE BOOTH, | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |
| | ) | |

VERELLEN, J. — The defendant in this matter sought to exercise a peremptory challenge to a prospective juror who is a member of a cognizable racial minority, and the State made a GR 37 objection, arguing race "could" have been a factor underlying the peremptory challenge. The trial court agreed and concluded GR 37 prohibited the peremptory challenge.

We conclude the trial court erred. Thus, this appeal presents the question of the appropriate remedy when a trial court mistakenly denies the defendant's exercise of a peremptory challenge in the context of applying GR 37. Peremptory challenges are not required by the federal or state constitutions. Because the error here does not fit within the narrow class of per se reversible errors and there is no showing of any prejudice from the erroneous seating of an otherwise competent, unbiased juror, retrial is not required.

Therefore, we affirm.

No. 82039-7-I/2

## FACTS

Kristin Booth moved from Alaska to Washington in the summer of 2017. On August 9, 2017, she went to a Metallica concert in Seattle with her cousin. After the concert ended around 11:00 p.m., Booth and her cousin went to his hotel room to talk and catch up. While they were talking, Booth's cousin—a "very big guy"—began to say things that made Booth uncomfortable.[1] He tried to kiss her. That caused Booth to panic and flee to her car, feeling like she "just had to get out of there."[2] She began driving without knowing where she was going. According to Booth, she drank a single glass of wine at the concert and had another serving of wine at her cousin's hotel.

Around 3:30 a.m., Washington State Patrol Trooper Cliff Roberts took the I-5 ramp for Boeing Access Road and saw a car remain stopped at a traffic light the entire time the light was green. When the car drove, it was drifting over lane lines and failed to stop even after he turned on his patrol car's emergency lights. After the car stopped and the driver rolled down her window, Trooper Roberts smelled a "very, very strong odor of alcoholic beverages coming from within the car."[3] Booth was driving. Her eyes were bloodshot and watery, and she had a "glazed over," "totally expressionless," "thousand-yard stare" on her face.[4] She

---

[1] Report of Proceedings (RP) (Aug. 27, 2019) at 158.

[2] Id.

[3] Id. at 31.

[4] Id. at 32.

2

No. 82039-7-I/3

struggled to answer Trooper Roberts' questions, seeming "very, very forgetful, like she wasn't sure what she was doing that evening."[5]

Trooper Roberts arrested Booth on suspicion of driving under the influence (DUI).  Booth did not consent to sobriety tests, and her blood-alcohol content was never measured.  As Trooper Roberts testified at trial, he decided against getting a warrant for a blood draw "because she was so obviously intoxicated that I didn't feel that it was necessary to wake up a judge at 3:30 in the morning to prove this case.  Ms. Booth was extremely intoxicated, and that was my opinion."[6]

Pretrial, Booth's defense theory was that her appearance and behavior resulted from memories of past sexual trauma being triggered by her cousin's unwanted physical advance.[7]  Booth sought to testify about the details of the assaults that traumatized her.  The court limited Booth's testimony about her past to stating she had a "history of victimization," and it allowed testimony about her mental state after her cousin's unwanted advance.[8]

The jury venire was 24 people.  Jurors 1 through 6 would be the presumptive jury, and juror 7 was the presumptive alternate.  If a juror was dismissed, then the higher-numbered jurors would slide down to fill the position.  The jury pool was predominantly white.  Four prospective jurors were each

---

[5] Id. at 43.

[6] Id. at 138.

[7] Because Booth's first trial ended in a mistrial, the pretrial rulings date to April of 2019.  The court reaffirmed its rulings before the second trial.

[8] RP (Apr. 15, 2019) at 131-32.

identified as a possible "member of a 'cognizable racial group'":[9] jurors 6, 10, 16, and 20.  The court dismissed juror 16 for cause, and juror 20 was excused due to hardship.

During voir dire, jurors 7, 14, 23, and 24 self-identified as believing it was "never okay" to drive after having anything to drink.[10]  Juror 6, who was of East Asian descent, appeared to be "mulling over" the question, and defense counsel asked for his thoughts.[11]  He gave a nuanced answer making clear he was uncomfortable with anyone having a drink and then driving, but he did not believe it was "never okay."[12]  Defense counsel did not ask jurors 7, 14, 23, or 24 any follow-up questions.  Instead, he asked whether any jurors had ever had a drink and driven.  Juror 10, who also appeared to be of East Asian descent, explained he had done so and was comfortable doing so because he was unaffected after having only a few sips of alcohol two hours before driving.

Later, defense counsel asked whether any juror would change the law to completely prohibit drinking and driving.  Juror 6 immediately volunteered an answer, explaining he "would probably be comfortable signing that into law" if there was "a very quick test that one could take [before driving], like a breathalyzer

---

[9] City of Seattle v. Erickson, 188 Wn.2d 721, 732, 398 P.3d 1124 (2017) (quoting Batson v. Kentucky, 476 U.S. 79, 96, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)).

[10] RP (Aug. 26, 2019) at 174.

[11] Id.

[12] Id.

. . . [b]ut something more objective."[13]  Rather than ask juror 6 a follow-up question, defense counsel asked the venire what they would want to know to figure out whether someone drank and drove.

After being asked whether any juror believed Booth "must have done something wrong" to be on trial, juror 13 volunteered the belief that she "likely" did something wrong because she was on trial.[14]  Defense counsel moved to strike juror 13 for cause, and the court denied the motion.  Later in voir dire, responding to one of the prosecutor's questions, juror 13 explained, "I personally, I would do anything to prove my innocence" if pulled over for drunk driving, including consenting to sobriety tests.[15]  Juror 6 largely agreed with juror 13's comment, opining, "[I]f a law enforcement officer asks you to do something, [you should] probably follow their instructions."[16]

Each side had three peremptory challenges.  The State used its peremptory challenges on jurors 3, 9, and 11.  Defense counsel asserted its peremptory challenges to jurors 6, 7, and 13.  The State made a GR 37 motion regarding juror 6.  The court sustained the State's motion and denied the defense peremptory challenge of juror 6.  The jury was comprised of jurors 1, 2, 4, 5, 6, 8, and juror 10 was the alternate.  Had the peremptory challenge of juror 6 been allowed, juror 10 would have deliberated, and juror 14 would have been the alternate.

---

[13] Id. at 176.

[14] Id. at 181-82.

[15] Id. at 188.

[16] Id. at 189.

During trial, Trooper Robertson gave detailed testimony about his stop, investigation, and arrest of Booth. He repeatedly testified Booth was "intoxicated."[17] He explained Booth never consented to sobriety tests. During his testimony, the State asked twice whether he had "doubt" about Booth being intoxicated or unsafe to drive.[18] Booth objected to both questions, and, both times, the court instructed the jury to disregard. Booth testified about drinking only two servings of wine, about her cousin's attempt to kiss her, about having been victimized in the past, about feeling panicked and confused the night she was arrested, and about her feelings of panic preventing her from deciding whether to consent to sobriety tests.

Juror 6 deliberated, and the jury found Booth guilty both of DUI and of refusing to submit to a breath test. Booth filed a RALJ appeal, and the superior court affirmed her convictions.

Commissioner Koh granted Booth's motion for discretionary review of the GR 37 issue.[19]

---

[17] E.g., RP (Aug. 27, 2019) at 44.

[18] Id. at 99.

[19] Commissioner Koh passed to the panel whether to grant review of the two other issues identified in Booth's petition for discretionary review. We conclude review is not warranted on either issue because neither satisfies any criterion in RAP 2.3(d).

ANALYSIS

We review a trial court's decision on a GR 37 motion de novo.[20]  In State v.

Jefferson,[21] our Supreme Court incorporated GR 37 into state common law by

replacing the third step of a Batson[22] challenge with the standards from the rule.[23]

The same standards apply whether the State or a defendant makes a GR 37

motion to prevent a peremptory challenge.[24]

The party bringing the GR 37 motion must first establish a prima facie case

by demonstrating "that the struck juror is a member of a 'cognizable racial

group.'"[25]  We presume a "'discriminatory purpose when the sole member of a

racially cognizable group has been struck from the jury.'"[26]  Second, the burden

shifts to the party exercising the peremptory challenge to provide a race-neutral

justification.[27]  Third, the trial court applies the standard from GR 37(e) to

---

[20] State v. Omar, 12 Wn. App. 2d 747, 751, 460 P.3d 225, review denied, 196 Wn.2d 1016, 475 P.3d 164 (2020).

[21] 192 Wn.2d 225, 429 P.3d 467 (2018) (plurality op.).

[22] Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

[23] State v. Orozco, 19 Wn. App. 2d 367, 374, 496 P.3d 1215 (2021) (citing State v. Jefferson, 192 Wn.2d 225, 244-45, 429 P.3d 467 (2018) (plurality op.)).

[24] See, e.g., State v. Listoe, 15 Wn. App. 2d 308, 319, 475 P.3d 534 (2020) (discussing standards to review a GR 37 motion made by a defendant); Omar, 12 Wn. App. 2d at 750-53 (discussing standards to review the trial court's application of GR 37 to an attempted peremptory challenge).

[25] Erickson, 188 Wn.2d at 732 (quoting Batson, 476 U.S. at 96).

[26] Orozco, 19 Wn. App. 2d at 374 (quoting Erickson, 188 Wn.2d at 734).

[27] Listoe, 15 Wn. App. 2d at 320 (citing Batson, 476 U.S. at 97; Jefferson, 192 Wn.2d at 232).

7

determine "whether an objective observer could view race or ethnicity as a factor in the use of the peremptory strike."[28]

Under the GR 37(e) "objective observer" standard, we take a rational view of "the totality of circumstances."[29]  We "evaluate the reasons given to justify the peremptory challenge in light of the totality of circumstances"[30] to understand whether the striking party's reasons for exercising the strike could have masked a decision based, consciously or unconsciously, on racial bias.[31]  We pay particular attention to circumstances identified in GR 37(g) when reviewing the record.  If race "could" have been "a factor," then the strike must be denied.[32]  But because we consider the total circumstances objectively, we give equal weight to all of the evidence when determining whether race "could" have been a factor.

For example, in State v. Omar,[33] a defendant was charged with first-degree robbery.  During voir dire, defense counsel asked whether anyone had experience

---

[28] Jefferson, 192 Wn.2d at 229-30.

[29] GR 37(e); see Omar, 12 Wn. App. 2d at 750 (a reviewing court "'stands in the same position as does the trial court,'" considering both the trial record and trial court's conclusions) (quoting Jefferson, 192 Wn.2d at 249-50).

[30] GR 37(e).

[31] See Chong Yim v. City of Seattle, 194 Wn.2d 651, 675, 451 P.3d 675 (2019) (noting GR 37 was enacted to mitigate implicit bias in jury selection); Jefferson, 192 Wn.2d at 249-50 (explaining the GR 37 analysis "is an objective inquiry based on the average reasonable person—defined here as a person who is aware of the history of explicit race discrimination in America and aware of how that impacts our current decision making in nonexplicit, or implicit, unstated, ways").

[32] Jefferson, 192 Wn.2d at 230; GR 37(e).

[33] 12 Wn. App. 2d 747, 748, 460 P.3d 225 (2020).

with robbery.[34]  Juror 16, who appeared to be of Asian descent, said she had been working at a bank when it was robbed and was unsure whether the experience would affect her ability to be fair.[35]  Defense counsel did not ask any follow-up questions.[36]  Defense counsel exercised a peremptory challenge to juror 16, and the trial court applied GR 37 to the attempted peremptory challenge.[37]  Defense counsel said he felt "uncomfortable about the way she was responding," he "didn't like some of [her] responses," and he "would feel uncomfortable having her on the jury."[38]  The trial court applied GR 37 and denied the peremptory challenge.[39]

This court evaluated defense counsel's reasons within the total circumstances by applying, where possible, each of the analytical criteria in GR 37(g).[40]  It concluded defense counsel's explanations were "nebulous" and "fail[ed] to identify specific problems with [the juror's] responses," thus allowing the possibility that they masked unconscious bias.[41]  Because the totality of the circumstances showed this possibility existed, we affirmed the trial court.[42]

---

[34] Id. at 748.

[35] Id.

[36] Id.

[37] Id. at 749.

[38] Id.

[39] Id.

[40] Id. at 753.

[41] Id. at 754.

[42] Id. at 754-55.

No. 82039-7-I/10

In <u>State v. Lahman</u>, the court reversed convictions for domestic violence kidnapping and assault because the trial court erroneously applied GR 37 to allow a peremptory challenge.[43] Juror 2 was a 23-year-old man who was one of the few members of a cognizable racial or ethnic group in the jury pool.[44] The venire completed a jury questionnaire that asked about a past history with domestic violence, and neither juror 2 nor 22 of the other venirepersons reported any such experience.[45] The prosecutor asked juror 2 only one question, whether it was important to serve on a jury, and juror 2 said it was.[46] Defense counsel asked juror 2 only one question, whether he would decide based upon the evidence and not be swayed by group pressure, and juror 2 said he would.[47] The prosecutor exercised a peremptory challenge to juror 2, and the defense made a GR 37 motion.[48] The prosecutor explained, "I would generally not have a younger person sit on a case like this. They don't have life experiences and he didn't have any [experience] with [domestic violence]."[49] The trial court denied the GR 37 motion, and juror 2 was struck.[50] Nine of the seated jurors had, like juror 2, no experience

---

[43] 17 Wn. App. 2d 925, 928-29, 488 P.3d 881 (2021).

[44] <u>Id.</u> at 929.

[45] <u>Id.</u>

[46] <u>Id.</u> at 929-30.

[47] <u>Id.</u> at 930.

[48] <u>Id.</u> at 931.

[49] <u>Id.</u>

[50] <u>Id.</u>

with domestic violence.[51]  The reviewing court concluded the prosecutor's

explanation about domestic violence experience was as applicable to juror 2 as to

other venirepersons, making "the State's explanation . . .  insufficient to dispel the

concern that 'an objective observer <u>could</u> view race or ethnicity as a factor' in Juror

2's exclusion."[52]

As <u>Omar</u> and <u>Lahman</u> illustrate, a court must consider the striking party's

reasons within the total circumstances to conclude whether the proffered reasons

leave the possibility that race could have been a factor.

Here, defense counsel made a peremptory challenge to juror 6, and the

State made a GR 37 motion to block the strike.  There was no dispute that juror 6

was of East Asian descent, so the State established a prima facie case of

discrimination.[53]  However, we do not presume a discriminatory purpose because

juror 10, the alternate, was also identified as being of Asian descent.[54]

Next, we consider defense counsel's reasons for challenging juror 6.

> DEFENSE COUNSEL:  Your Honor, I spoke with [juror 6] fairly extensively regarding his perceptions about drinking anything and then driving thereafter—
>
> THE COURT:  Right.
>
> DEFENSE COUNSEL:  And he seemed to harbor certain positions that I found to be potentially inconsistent with being able to decide and balance the issues we have before the court.  The only reason he was the first individual struck was that by the previous

---

[51] <u>Id.</u> at 931.

[52] <u>Id.</u> at 937 (quoting GR 37(e)).

[53] <u>Erickson</u>, 188 Wn.2d at 732 (citing <u>Batson</u>, 476 U.S. at 96).

[54] <u>Orozco</u>, 19 Wn. App. 2d at 374 (quoting <u>Erickson</u>, 188 Wn.2d at 734).

individuals before that person in the queue, I was satisfied with those individuals previously. Just by [juror 6], just where he happened to be sitting; and the answers primarily, the answers that he gave to my questions about how, what he thought about certain things and how they related to alcohol and driving.

THE COURT: Right.

DEFENSE COUNSEL: That was the primary basis of that particular request.

. . . .

DEFENSE COUNSEL: . . . I believe [juror 6] made enough commentary where one can make the deduction that perhaps he was not going to be a good fit for this particular jury.

THE COURT: Now my memory of [juror 6's] answers—and that he was questioned by the defense is my memory. And when we were talking about basically zero tolerance, that he initially indicated that you shouldn't drink and drive. And I think there were four or five jurors who said that. And then, specifically, with a discussion with him in it, it turned to, "Well, he always waits a couple of hours." I think he was the one who said that. And the—

DEFENSE COUNSEL: Yeah, he started talking a little bit more in depth about—

THE COURT: And that then it's okay.

DEFENSE COUNSEL: About how he would otherwise assess that particular situation. But, I believe, also, if I recall correctly, he is the individual who also spoke to me, spoke with me at a little further length when it came to if he could otherwise potentially change the laws [to prohibit all driving after drinking,] that he might otherwise do so.[55]

We evaluate defense counsel's reasons for the challenge by considering them objectively within the total circumstances, taking particular note of the five considerations in GR 37(g):

---

[55] RP (Aug. 26, 2019) at 194-96.

12

No. 82039-7-I/13

> (i) the number and types of [q]uestions posed to the prospective juror, which may include consideration of whether the party exercising the peremptory challenge failed to [q]uestion the prospective juror about the alleged concern or the types of [q]uestions asked about it;
>
> (ii) whether the party exercising the peremptory challenge asked significantly more [q]uestions or different [q]uestions of the potential juror against whom the peremptory challenge was used in contrast to other jurors;
>
> (iii) whether other prospective jurors provided similar answers but were not the subject of a peremptory challenge by that party;
>
> (iv) whether a reason might be disproportionately associated with a race or ethnicity; and
>
> (v) whether the party has used peremptory challenges disproportionately against a given race or ethnicity, in the present case or in past cases.[56]

Relevant here are considerations (i), (ii), and (iii) because the record does not implicate considerations (iv) and (v).

Considerations GR 37(g)(i) and (ii) ask us to analyze the decision and reasons for the strike in light of the number and type of questions posed to juror 6 compared to other jurors. Because consideration (ii) requires comparing juror 6 to other member of the venire, our analysis focuses on factually similar jurors.[57] Juror 6 had two questions put directly to him, juror 7 had two, and juror 14 had

---

[56] Omar, 12 Wn. App. 2d at 752 (citing GR 37(e); GR 37(g)).

[57] Cf. Miller-El v. Dretke, 545 U.S. 231, 241, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005) ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step.") (citing Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)).

13

three.  Specifically, defense counsel posed two questions to juror 6, two questions to juror 14, and one question to juror 7.  Although juror 6 spoke often, he volunteered his answers—such as to the question about changing the law— because defense counsel typically posed his questions to the entire venire rather than to individual jurors.

Only once did defense counsel choose to ask only juror 6 a question when someone could also expect jurors 7 and 14 to be called on for follow-up: when defense counsel asked juror 6 to provide an answer after jurors 7 and 14 raised their hands to indicate a zero-tolerance attitude toward drinking and driving.  But defense counsel did so because juror 6 "appeared to be mulling" the question over rather than raising his hand, like jurors 7 and 14, or not reacting, like jurors 1 through 5.[58]  Because juror 6 would be seated unless struck, defense counsel needed a clear answer.  Viewed objectively, GR 37(g)(i) and (ii) do not show juror 6's race or ethnicity was a factor in defense counsel's use of a peremptory challenge.

GR 37(g)(iii) asks us to consider the reasons for the defense's peremptory challenge in light of whether jurors who were not the subject of a challenge by defense counsel gave similar answers as juror 6.  Defense counsel's decision was based upon juror 6's presumptive place on the jury from his low juror number and upon answers that revealed discomfort with drinking and driving, including his desire for a zero-tolerance law.  Thus, the comparable jurors—someone with an

---

[58] RP (Aug. 26, 2019) at 174.

No. 82039-7-I/15

express zero-tolerance approach to drinking and driving and a strong likelihood of being empaneled—were jurors 7 and 14.[59]

Jurors 6, 7, and 14 gave similar "zero tolerance" answers. Defense counsel exercised peremptory challenges on jurors 6 and 7. Juror 14 was not challenged, which, as the State argues, has the potential to suggest race could have been a factor.

But defense counsel also explained a low juror number was a reason for exercising a peremptory challenge. Jurors 6 and 7 were challenged and were both presumptive members of the jury. Because a juror would become a presumptive panel member as jurors with lower numbers were removed, defense counsel had to decide whether to use a peremptory challenge on juror 13 because juror 13 would be empaneled before juror 14.

Juror 13 said anyone on trial "likely" did something wrong, causing defense counsel to make a for-cause challenge.[60] And juror 13 said he would do anything to "prove my innocence" if pulled over for suspicion of DUI, including taking a sobriety test.[61] Juror 6 largely agreed with juror 13 and said "if a law enforcement

_____

[59] Although GR 37(g)(iii) asks us to focus on jurors whom defense counsel did not peremptorily strike, and juror 7 was struck, GR 37(e) requires that we consider the "totality of circumstances." Thus, we compare juror 6 with jurors 7 and 14. Jurors 23 and 24 also raised their hands when asked if it was "never okay" to have a drink and then drive, but they were not likely to be empaneled because each side had only three peremptory challenges and the total venire was 24 jurors.

[60] RP (Aug. 26, 2019) at 181-82.

[61] Id. at 188.

15

officer asks you to do something, [you should] probably follow their instructions."[62]

Trooper Roberts was going to, and later did, testify about Booth failing to consent

to sobriety tests. It was within these circumstances defense counsel had to

choose between the risk of juror 13 or 14 being empaneled. Defense counsel's

attempt at a for-cause challenge showed his belief that juror 13 was actually

biased, and juror 13 knew defense counsel did not want them empaneled because

of the for-cause challenge. Given their juror numbers and responses, the

GR 37(g)(iii) consideration weighs against concluding race could have been a

factor. Under the total circumstances, defense counsel's reasons for challenging

jurors 6, 7, and 13 but not juror 14 rebut the possibility that race could have been a

factor.

Unlike Omar, defense counsel here articulated specific reasons to

challenge juror 6, and those reasons were supported by the record. And, unlike

Lahman, defense counsel exercised a peremptory challenge on juror 6 after he

spoke extensively during voir dire and expressed considerable discomfort with

people who drink and drive. Although the State urges us to focus exclusively on

the possibility that race could have been a factor, because defense counsel did not

challenge juror 14, we review a GR 37 decision objectively and comprehensively,

not superficially and narrowly.[63] Because the totality of the circumstances,

including the considerations under GR 37(g), would not lead an objective observer

---

[62] Id. at 189.

[63] Omar, 12 Wn. App. 2d at 750 (quoting Jefferson, 192 Wn.2d at 249-50); GR 37(e).

to conclude race could have been a factor in defense counsel's decision to exercise a peremptory challenge on juror 6, the trial court erred by granting the State's GR 37 motion and denying defense counsel's strike.

This error presents a new, but not novel, question under Washington law: What is the proper remedy when a trial court erroneously grants a GR 37 motion made by the State, thereby causing a juror to be wrongfully empaneled over the defendant's peremptory challenge?  Because GR 37 applies in all civil and criminal jury trials,[64] we must consider the perspectives of the court, jurors, and the parties to determine the proper remedy.

When a juror is erroneously struck and race or ethnicity could have been a factor, it implicates that juror's right to equal protection.[65]  This constitutional error "'undermine[s] the very foundation of our system of justice,'"[66] making it a per se reversible error, also called "structural error."[67]  Thus, a typical remedy for a GR 37 error is a new trial.[68]  But these fundamental concerns are inapposite when a juror

---

[64] GR 37(b).

[65] Rivera v. Illinois, 556 U.S. 148, 161, 129 S. Ct. 1446, 173 L. Ed. 2d 320 (2009) (quoting Batson, 476 U.S. at 86, 87); Jefferson, 192 Wn.2d at 239 (citing Strauder v. West Virginia, 100 U.S. 303, 309-10, 25 L. Ed. 664 (1880)).

[66] Georgia v. McCollum, 505 U.S. 42, 49-50, 55, 112 S. Ct. 2348, 120 L. Ed. 2d 33 (1992) (quoting State v. Alvarado, 221 N.J. Super. 324, 328, 534 A.2d 440, 442 (1987)).

[67] Crittenden v. Chappell, 804 F.3d 998, 1003 (9th Cir. 2015) (citing Williams v. Woodford, 396 F.3d 1059, 1069 (9th Cir. 2005)).

[68] Orozco, 19 Wn. App. 2d at 377 (citing Lahman, 17 Wn. App. 2d at 884; Listoe, 15 Wn. App. 2d at 329); see In re Det. of Reyes, 184 Wn.2d 340, 345, 358 P.3d 394 (2015) ("Once we find that a structural error occurred, we presume

17

No. 82039-7-I/18

has been erroneously empaneled due to a GR 37 error. Because the erroneous

empaneling of a juror does not implicate that juror's right to equal protection, we

must consider whether the error prejudiced the defendant's constitutional rights,

potentially causing a per se reversible error.[69]

Booth argues erroneous denial of a peremptory challenge is per se

reversible error. Certain constitutional errors are automatically reversible when

they "'necessarily render a criminal trial fundamentally unfair or an unreliable

vehicle for determining guilt or innocence.'"[70] But there is no right to a peremptory

challenge under either the United States Constitution or the Washington

Constitution,[71] so the erroneous loss of a peremptory challenge does not

undermine the fundamental judicial process.[72] Because per se reversible errors

are limited to "fundamental constitutional errors,"[73] and there is no constitutional

---

prejudice and remand for a new trial.") (citing In re Pers. Restraint of Orange, 152 Wn.2d 795, 814, 100 P.3d 291 (2004)).

[69] See Reyes, 184 Wn.2d at 345 ("Structural error falls under a special category of constitutional error that 'affect[s] the framework within which the trial proceeds, rather than simply an error in the trial process itself.'") (alteration in original) (quoting Arizona v. Fulminante, 499 U.S. 279, 310, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991)).

[70] Matter of Meredith, 191 Wn.2d 300, 309, 422 P.3d 458 (2018) (quoting Washington v. Recuenco, 548 U.S. 212, 218-19, 126 S. Ct. 2546, 165 L. Ed. 2d 466 (2006)) (internal quotation marks and alteration omitted).

[71] Rivera, 556 U.S. at 157 (citing cases); Meredith, 191 Wn.2d at 309 (quoting State v. Kender, 21 Wn. App. 622, 626, 587 P.2d 551 (1978)).

[72] Meredith, 191 Wn.2d at 312.

[73] Neder v. United States, 527 U.S. 1, 7, 119 S. Ct. 1827, 114 L. Ed. 2d 35 (1999) (citing Fulminante, 499 U.S. at 309). We note that a narrow class of cases has held automatic reversal is the appropriate remedy when the error is not expressly constitutional. See, e.g., Rivera, 556 U.S. at 161 (explaining per se

No. 82039-7-I/19

right to a peremptory challenge in Washington,[74] erroneous denial of a peremptory strike is not per se reversible error.[75]

Booth relies upon State v. Vreen[76] to assert the trial court's error is per se reversible. In 2001, before the enactment of GR 37, our Supreme Court decided Vreen and held "erroneous denial of a litigant's peremptory challenge" requires retrial when "the objectionable juror actually deliberates."[77] Vreen relied heavily on a line of federal circuit court decisions,[78] particularly United States v. Annigoni,[79]

_____

reversible error can occur when a "federal judge or tribunal lacked statutory authority to adjudicate the controversy"). But those cases involve jurisdictional issues, which are, fundamentally, constitutional matters. See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 101-02, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998) ("The statutory and (especially) constitutional elements of jurisdiction are an essential ingredient of separation and equilibration of powers, restraining the courts from acting at certain times, and even restraining them from acting permanently regarding certain subjects.") (citing United States v. Richardson, 418 U.S. 166, 179, 94 S. Ct. 2940, 41 L. Ed. 2d 678 (1974); Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 227, 94 S. Ct. 2925, 41 L. Ed. 2d 706 (1974)); In re Schneider, 173 Wn.2d 353, 360, 268 P.3d 215 (2011) (noting the "broad constitutional grant of jurisdiction" from art. IV, § 6 on superior courts and explaining lack of jurisdiction makes an order void) (citing Orwick v. City of Seattle, 103 Wn.2d 249, 251, 692 P.2d 793 (1984); Marley v. Dep't of Labor & Indus., 125 Wn.2d 553, 541, 886 P.2d 189 (1994)). Thus, a per se reversible error must, in some way, involve a "fundamental constitutional error." Neder, 527 U.S. at 7.

[74] Meredith, 191 Wn.2d at 309 (quoting Kender, 21 Wn. App. at 626).

[75] Booth does not argue a statute or court rule requires automatic reversal due to erroneous denial of a peremptory challenge.

[76] 143 Wn.2d at 923, 932, 26 P.3d 236 (2001).

[77] Id.

[78] Id. at 930-31.

[79] 96 F.3d 1132 (9th Cir. 1996).

19

as the basis for its conclusion.  <u>Vreen</u> also cited <u>State v. Evans</u>[80] for support,[81] and

<u>Evans</u> relied solely upon <u>Annigonni</u> to conclude the remedy was automatic

retrial.[82]  Thus, <u>Vreen</u> rested on the then-debatable proposition that peremptory

strikes were, like a constitutional guarantee, part of the fundamental fabric of the

judicial process.

But, in <u>Rivera v. Illinois</u>, the United States Supreme Court unanimously

abrogated <u>Annigonni</u> and similar holdings.[83]  The United States Constitution does

not guarantee peremptory challenges, so "the loss of a peremptory challenge due

to a state court's good-faith error is not a matter of federal constitutional

concern."[84]  Erroneous denial of a peremptory strike is not per se reversible error

in the federal judicial system.[85]  The Court left states free to decide whether to

offer peremptory strikes and how to regulate them.[86]

<u>Vreen</u> had concluded automatic retrial is the correct remedy for improper

denial of a defendant's peremptory strike but did so without deciding whether the

error was constitutional and fundamental in magnitude.  Years later, the United

---

[80] 100 Wn. App. 757, 998 P.2d 373 (2000).

[81] 143 Wn.2d at 931 (citing <u>id.</u> at 774).

[82] <u>Evans</u>, 100 Wn. App. at 774.

[83] 556 U.S. 148, 160-62, 129 S. Ct. 1446, 173 L. Ed. 2d 320 (2009).

[84] <u>Id.</u> at 157.

[85] <u>Id.</u> at 161-62.

[86] <u>Id.</u>

No. 82039-7-I/21

States Supreme Court in Rivera[87] and our Supreme Court in Matter of Meredith[88] concluded it was not. Because Rivera and Meredith clearly and decisively held peremptory strikes are not part of the constitutional structure of the judicial process and automatic reversal and retrial is appropriate only when an error is constitutionally infirm,[89] the remedy identified in Vreen is unsupported.[90]

The remedy in Vreen is also inapposite to GR 37, which was adopted by our Supreme Court in 2018. The express purpose of GR 37 is "to eliminate the unfair exclusion of potential jurors based on race or ethnicity."[91] To facilitate this goal, parties must feel free to bring GR 37 motions to challenge peremptory strikes, and courts must feel free to grant those motions. But parties and courts would be "dissuaded" from bringing or granting GR 37 motions if we "h[e]ld that a one-time, good-faith misapplication" of GR 37 automatically requires retrial.[92]

Booth's position would also lead to an incongruous result: valuing a nonconstitutional trial tool more than a constitutionally valid verdict of a competent, unbiased jury. As expressly observed in Rivera, erroneous denial of a peremptory challenge merely results in "the improper seating of a competent and unbiased

---

[87] Id. at 157.

[88] 191 Wn.2d 300, 309, 422 P.3d 458 (2018).

[89] Neder, 527 U.S. at 7; Reyes, 184 Wn.2d at 345.

[90] See Johnson v. United States, 520 U.S. 461, 468-69, 117 S. Ct. 1544, 137 L. Ed. 2d 718 (1997) (noting structural error exists "only in a very limited class of cases") (citing cases).

[91] GR 37(g)(a).

[92] Rivera, 556 U.S. at 160.

No. 82039-7-I/22

juror."[93]  Thus, a party denied a peremptory challenge in this setting is unlikely to suffer prejudice from an unfair trial.

Because erroneous denial of a peremptory challenge alone does not present a constitutional issue, we analyze the error using the nonconstitutional harmless error standard.[94]  Under this standard, an "'error is not prejudicial unless, within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'"[95]

Booth does not explain how juror 6's presence on the jury made a difference.  She does not argue juror 6 could have been challenged for cause, and, in fact, the trial court explained it would not have sustained a for-cause challenge to juror 6, given his answers.  And, assuming the jury found Trooper Roberts credible, his testimony provided overwhelming evidence of Booth's guilt.  Thus, Booth fails to show prejudice because the record does not suggest juror 6's absence would have changed the outcome.[96]

We recognize that this standard may be difficult to meet because it requires proving prejudice from the presence of a competent, unbiased juror.[97]  But this

---

[93] 556 U.S. at 162.

[94] State v. Robinson, 153 Wn.2d 689, 697, 107 P.3d 90 (2005) (citing State v. Templeton, 148 Wn.2d 193, 220, 59 P.3d 632 (2002)).

[95] State v. Aljaffar, 198 Wn. App. 75, 86, 392 P.3d 1070 (2017) (quoting State v. Cunningham, 93 Wn.2d 823, 831, 613 P.2d 1139 (1980)).

[96] Id. (quoting Cunningham, 93 Wn.2d at 831).

[97] See People v. Kabongo, 507 Mich. 78, 137, 968 N.W.2d 264, 300 (concluding erroneous denial of a peremptory challenge was a nonconstitutional harmless error and noting "for all intents and purposes, harmless-error review will almost always result in automatic affirmance"), cert. denied sub nom. Kabongo v.

22

difficult standard is rooted in controlling precedent about per se reversible error, and it supports the purpose and function of GR 37. Under the conditions here, we need not speculate about the set of facts that could justify retrial due solely to the good faith, erroneous empaneling of an unbiased juror.

Therefore, we affirm.

_____

WE CONCUR:

_____  _____

---

Michigan, 21-1094, 2022 WL 1131390 (U.S. Apr. 18, 2022); Vreen, 143 Wn.2d at 931 ("'It would be difficult if not impossible for a reviewing court to determine the degree of harm resulting from erroneously allowing a juror to sit despite an attempted peremptory challenge.'") (quoting Annigoni, 96 F.3d at 1145).