[No. 18570-2-III. Division Three. December 12, 2000.]

THE STATE OF WASHINGTON, *Respondent*, v. VY THANG, *Appellant*.

*Vy Thang*, pro se.

*Paul J. Wasson II*, for appellant.

*Steven J. Tucker, Prosecuting Attorney*, and *Kevin M. Korsmo, Deputy*, for respondent.

BROWN, J. — A jury found Vy Thang guilty of aggravated first degree murder. In the published portion of this opinion, we decide two unique issues raised by Mr. Thang. First, should prior conviction evidence have been allowed for identity under ER 404(b) in the State's rebuttal after Mr. Thang initially (1) introduced the evidence in his direct testimony, and (2) identified another possible perpetrator through his and another witness's testimony? Second, does an escapee have a legitimate expectation of privacy in a host's premises? Because Mr. Thang opened the door for the admission of the ER 404(b) evidence in the defense case and, after the court so ruled, then preemptively brought the evidence before the jury in a manner that additionally permitted rebuttal, we reject his first claim of error. Next, we decide Mr. Thang, as an escapee, lacked a reasonable expectation of privacy in his host's premises. We reject all other claims of reversible error in the unpublished portion of this opinion. Accordingly, we affirm.

## FACTS

On September 2, 1997, John Klaus discovered his 85-

year-old mother, Mildred Klaus, dead in her house. August 29, 1997 was determined to be the date of death. Evidence of foul play was apparent due to multiple blunt impact injuries. Within days, the police investigation led to a nearby apartment where Mr. Thang, an escapee from a state juvenile detention facility, was located and connected to Ms. Klaus's death. The State ultimately charged Mr. Thang with one count of premeditated murder in the first degree with aggravating circumstances, and alternately one count of murder in the first degree.

Before trial, the State unsuccessfully moved in limine to admit ER 404(b) evidence of a similar robbery, burglary and assault committed by Mr. Thang in 1996. The trial court reconsidered and reversed its ER 404(b) ruling at trial after an unexpected defense witness, Lawrence Dusek, testified that Simeon Terry was the main perpetrator.

Mr. Terry was Mr. Thang's fellow escapee and a key State's witness pursuant to a plea bargain. According to Mr. Terry, he and Mr. Thang were staying with one of Mr. Terry's friends, Jess Dietzen, on August 29. Mr. Terry testified that at about 5:00 p.m. that day, Mr. Thang borrowed his black leather gloves, left that apartment, and returned at approximately 10:00 p.m. Upon his return, Mr. Thang told Mr. Terry "[t]he bitch is dead, this bitch is dead." When asked by Mr. Terry what he meant, Mr. Thang said he had broken into a house and "killed an old lady." According to Mr. Terry, Mr. Thang said the old lady had fallen on the floor "and he kicked her." Mr. Terry told where Mr. Thang hid the victim's purse. Mr. Terry saw blood on Mr. Thang's Penny Hardaway Nike shoes and his socks.

Mr. Dietzen testified Mr. Thang left his apartment and returned later with a purse. Mr. Dietzen said he saw Mr. Thang throw the purse on top of a building. Police recovered Ms. Klaus's purse on the roof of a building. Mr. Dietzen's roommate, Sean Lambert, testified that he heard Mr. Thang say something about killing a woman. Mr. Lambert also said Mr. Thang was wearing Penny Hardaway Nike shoes.

Detective George Benavidez explained how the investigation became focused on Mr. Thang and Mr. Terry when police learned Mr. Terry had been staying at an apartment building near where Ms. Klaus's purse was found. When Detective Benavidez and other officers arrived at the apartment, Mr. Dietzen answered the door, confirmed the two fugitives were inside, and gave consent to enter and arrest them. After the arrests, Mr. Lambert gave written consent to search the apartment's common areas. Among the items recovered were Mr. Thang's Penny Hardaway Nike shoes and some bloody socks found in the trash, which were the source of the State's DNA evidence. Detective Benavidez testified Mr. Lambert later told him that Mr. Thang said he "killed that bitch." Detective Benavidez testified about a foreign coin found on Mr. Thang when he was arrested that John Klaus indicated was the type his mother "might have kept."

Over Mr. Thang's objection, David Sandvick testified that Mr. Terry told him early in September 1997 that Mr. Thang had broken into a house and killed a woman. On cross, Mr. Sandvick admitted giving Mr. Terry the leather gloves Mr. Thang allegedly wore on the night of the murder.

Mr. Thang defended on the theory that Mr. Terry was the principal actor in Ms. Klaus's death. His experts attacked the statistical reliability of the State's DNA evidence and criticized the crime lab's methods. Lawrence Dusek, an unexpected witness, testified just before Mr. Thang first rested. He said Mr. Terry told him that he murdered Ms. Klaus and that Mr. Thang had merely acted as lookout. According to Mr. Dusek, Mr. Terry told him that Mr. Thang turned Ms. Klaus's body over with his foot.

When Mr. Dusek completed his testimony and the court decided to allow the State to present the previously inadmissible ER 404(b) evidence, Mr. Thang successfully moved to reopen his case so he could testify on his own behalf. Mr. Thang testified that he and Mr. Terry were riding around on a bicycle when Mr. Terry told him to wait for a while in an alleyway. According to Mr. Thang, Mr. Terry came back and

led him to Ms. Klaus's house where he discovered Ms. Klaus's body and tried to move it with his leg.

Apparently in anticipation of the State's forthcoming ER 404(b) testimony on rebuttal, Mr. Thang testified he was incarcerated at Maple Lane for breaking into a house and robbing, assaulting, and burglarizing an elderly woman, Shirley Morgan, during a "burglary spree." Mr. Thang said he thought at the time that he had killed Ms. Morgan. On cross, Mr. Thang denied saying that he thought "the bitch is dead" when referring to Ms. Morgan. Mr. Thang said he obtained the foreign coin from a different house.

After resting, Mr. Thang unsuccessfully moved to prevent the State from calling Ms. Morgan. The trial court reasoned the defense had made identity an issue of consequence by introducing evidence that some other person killed Ms. Klaus. Further, Mr. Thang's version of the events permitted the State to introduce rebuttal evidence.

Ms. Morgan then briefly testified that two men broke into her house in Aberdeen, threw her across the room and kicked her three times in the ribs. At that point, no further testimony was elicited due to sustained defense objections. The court explained in a side bar conference, "any testimony from this witness should be limited to rebut the assertions which were outlined yesterday on the record by the Court." The court gave a limiting instruction:

> With respect to the testimony of Ms. Morgan who was the last witness, evidence has been introduced in this case on the subject of a prior act of the defendant's identity for the limited purpose of indicating identity. You must not consider this evidence for any other purpose.

The jury found Mr. Thang guilty of aggravated, premeditated first degree murder. The three aggravating circumstances were: (1) Mr. Thang was a fugitive; (2) Mr. Thang committed the murder to conceal the commission of a crime or to protect or conceal his identity; and (3) Mr. Thang committed the murder in furtherance of or in immediate flight from first degree burglary. After being sentenced to

life without possibility of parole, Mr. Thang filed this appeal.

## ANALYSIS

### A. Admissibility of ER 404(b) Identity Evidence

The issue is whether the trial court erred by abusing its discretion when deciding to allow evidence of Mr. Thang's prior convictions under the identity exception to ER 404(b).

■ We review a trial court's evidentiary ruling for an abuse of discretion. *State v. Lane*, 125 Wn.2d 825, 831, 889 P.2d 929 (1995). A trial court abuses its discretion when it is exercised on untenable grounds or for untenable reasons. *State v. Wade*, 138 Wn.2d 460, 464, 979 P.2d 850 (1999) (per curiam).

ER 404(b) states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of . . . identity . . . .

■ "In determining the admissibility of other crimes to prove identity, a trial court must determine that the evidence is relevant to identity and that any prejudicial effect is outweighed by the probative value." *State v. Russell*, 125 Wn.2d 24, 66, 882 P.2d 747 (1994). "The relevancy determination requires that the purpose for which the evidence is sought to be introduced is of consequence to the outcome of the action and that the evidence tends to make the existence of the identified fact more probable." *State v. Brown*, 113 Wn.2d 520, 526, 782 P.2d 1013, 80 A.L.R.4th 989 (1989) (citing *State v. Smith*, 106 Wn.2d 772, 776, 725 P.2d 951 (1986)); *State v. Saltarelli*, 98 Wn.2d 358, 362-63, 655 P.2d 697 (1982); ER 402.

■ When Mr. Dusek testified, the identity of the murderer was clouded. Thus, identity became of increased consequence to the outcome of the case. *Brown*, 113 Wn.2d at 527. The *Russell* court stated:

Evidence of other crimes is relevant on the issue of identity only if the method employed in the commission of both crimes is "so unique" that proof that an accused committed one of the crimes creates a high probability that he also committed the other crimes with which he is charged.

*Russell*, 125 Wn.2d at 66-67 (citing *State v. Hernandez*, 58 Wn. App. 793, 798-99, 794 P.2d 1327 (1990), *disapproved on other grounds by State v. Kjorsvik*, 117 Wn.2d 93, 812 P.2d 86 (1991)).

Significantly, the trial court here made two separate decisions in separate contexts. First, without knowing Mr. Thang would testify, it decided that the State could bring in evidence of the Aberdeen crimes because Mr. Dusek's testimony raised identity as an issue. Second, *after* Mr. Thang testified, and *before* the State had an opportunity to present its ER 404(b) identity testimony, the court decided the State could use Ms. Morgan's testimony for rebuttal of Mr. Thang's version of the crime. Thus, dual purposes existed for allowing the challenged evidence.

Since Mr. Thang's direct testimony tactically anticipated and blunted the State's ER 404(b) evidence by first admitting the prior crime, much of his argument related to the ER 404(b) issue became meaningless. Ms. Morgan's testimony was brief and less specific than Mr. Thang's testimony. Thus, it was cumulative. Mr. Thang's testimony established: (1) he entered Ms. Klaus's residence; (2) his leg made contact with her body; and (3) a year earlier he broke into Ms. Morgan's residence and assaulted her so severely he thought he had killed her. The "identity" question that remained, if any, was whether Mr. Thang or Mr. Terry dealt the lethal blows, a question raised by Mr. Thang in his defense.

The court's dual purpose for allowing Ms. Morgan's testimony was to permit rebuttal of Mr. Thang's version of how blood came to be found on his clothing in Ms. Klaus's case. The inference was that the blood came from kicking rather than merely turning over the body as Mr. Thang had testified. The court cautiously gave its limiting instruction,

to focus the use of the testimony to identification, rather than character. The rebuttal value of how the blood came to be on Mr. Thang's shoes and socks was left for the jury to decide. The court had previously balanced and rejected the ER 404(b) evidence when other purposes were argued. The court again weighed the effect of Mr. Dusek's testimony when striking the balance in favor of admitting the evidence for identity. The balancing process was moot when Mr. Thang tactically decided to give the critical evidence to the jury to blunt or eliminate its introduction by the State. Notably, Mr. Thang recognized the cumulative nature of Ms. Morgan's testimony when he argued her testimony was redundant when he later tried to prevent her testimony.

■ ■ Moreover, "[a]n accused cannot avail himself of error as a ground for reversal unless it has been prejudicial." *Smith*, 106 Wn.2d at 780 (citing *State v. Cunningham*, 93 Wn.2d 823, 831, 613 P.2d 1139 (1980)). A nonconstitutional error, like this " 'is not prejudicial unless, within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.' " *Smith*, 106 Wn.2d at 780 (quoting *Cunningham*, 93 Wn.2d at 831).

■ Here, no reasonable probability existed that Ms. Morgan's cumulative testimony alone materially affected the result. Because Ms. Morgan could not state who said what during her assault, the court excluded any testimony on this point. The court instructed the jury to disregard the "bitch" question. This court presumes the jury heeded that instruction. *State v. Hanna*, 123 Wn.2d 704, 711, 871 P.2d 135 (1994). In light of other evidence of guilt, particularly the blood evidence, Ms. Morgan's cumulative testimony was of no consequence. Even assuming the trial court erred, the error was harmless.

## B. Warrantless Search of Apartment

The issue is whether the trial court erred when denying Mr. Thang's motion to suppress the evidence collected at

Mr. Dietzen's apartment and concluding Mr. Thang, as an escapee, had no legitimate expectation of privacy while hiding in his host's premises.

 Mr. Thang, pro se, alleges a violation of both the federal and state constitutions. His state constitutional argument is not supported by the required *Gunwall* analysis. *State v. Gunwall*, 106 Wn.2d 54, 61-62, 720 P.2d 808, 76 A.L.R.4th 517 (1986). In any event, to prevail, Mr. Thang must demonstrate he had a legitimate expectation of privacy; an expectation society was prepared to recognize. *See United States v. Jacobsen*, 466 U.S. 109, 122-23, 104 S. Ct. 1652, 80 L. Ed. 2d 85 (1984) (comparing concept of interest in privacy that society is prepared to recognize with mere expectation that certain facts will not come to attention of authorities). The test as to whether a legitimate expectation of privacy exists is whether (1) the person subject to search "exhibited an actual (subjective) expectation of privacy[,]" and (2) whether that expectation was one "society is prepared to recognize as 'reasonable.'" *Katz v. United States*, 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967).

It appears no Washington court has considered whether an escapee has a legitimate expectation of privacy while hiding from authorities, but a number of courts in other jurisdictions have concluded they do not.

 Generally, a person whose presence at the searched premises is "wrongful" does not have a "legitimate" privacy expectation; society is not prepared to recognize such an expectation as "reasonable." *Rakas v. Illinois*, 439 U.S. 128, 143 n.12, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978). In this connection, an escapee is "no more than a trespasser on society." *United States v. Roy*, 734 F.2d 108, 111 (2d Cir. 1984) (citing *State v. Hiott*, 276 S.C. 72, 77, 276 S.E.2d 163 (1981)). An escapee abandons his sole legitimate place of residence and is therefore wrongfully on the premises in which he hides. *Hiott*, 276 S.E.2d at 165-66. "[A]n escapee [is] in constructive custody for the purpose of determining his legitimate expectations of privacy; he

should have the same privacy expectations in property in his possession inside and outside the prison." *Roy*, 734 F.2d at 111 (citing *Robinson v. State*, 312 So. 2d 15, 18 (Miss. 1975)).

These authorities are persuasive; Mr. Thang enjoyed no more expectation of privacy in the apartment than he did inside the juvenile institution. Convicted prisoners in Washington " 'have no legitimate expectation of privacy and . . . the Fourth Amendment's prohibition on unreasonable searches does not apply in prison cells . . . .' " *In re Personal Restraint of Benn*, 134 Wn.2d 868, 909, 952 P.2d 116 (1998) (quoting *Hudson v. Palmer*, 468 U.S. 517, 530, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984)).

Because Mr. Thang had no legal right to be anywhere other than his place of commitment, he has no standing to challenge the search on behalf of the apartment's lawful residents. *See Benn*, 134 Wn.2d at 909 (reasoning defendant did not have standing to challenge search of another prisoner's cell). Moreover, the trial court ruled, and the record clearly shows, that Mr. Thang's hosts gave the police consent to enter the apartment to apprehend the escapees and consent for the subsequent search.

Accordingly, we conclude the trial court did not err.

Affirmed.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder, having no precedential value, shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

KURTZ, C.J., and KATO, J., concur.

Review granted at 143 Wn.2d 1026 (2001).