IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 40197-9-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| VY THANG, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

STAAB, J. — Vy Thang appeals from his sentence imposed in 2015 at a *Miller*[1] resentencing for a conviction of aggravated first degree murder that he committed when he was 17 years old. Thang primarily contends that the trial court improperly emphasized retributive factors over the mitigating qualities of youth in violation of several cases published after he was sentenced.

We agree and conclude the trial court abused its discretion by failing to place greater emphasis on Thang's mitigating qualities of youth during resentencing. Accordingly, we remand for a new resentencing hearing. Because the court will be required to enter a new judgment and sentence, we do not address issues related to

---

[1] *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

community custody, fees, and assessments. Separately, we decline review of Thang's

cruel punishment challenge because it is unpreserved.

BACKGROUND

This is Thang's third direct appeal in this case. His case has a lengthy procedural

history, including two trials, two direct appeals, multiple personal restraint petitions

(PRPs), and a petition for a writ of habeas corpus in the United States Court for the

Eastern District of Washington. *See Thang v. Gay*, No. CV-07-235-LRS, 2008 WL

163619 (E.D. Wash. Jan. 15, 2008) (court order). This direct appeal arises from his 2015

resentencing hearing. This opinion discusses only the case facts relevant to the

resentencing hearing.

In 1996, sixteen-year-old Thang was convicted in Grays Harbor County of first

degree burglary, first degree robbery, and residential burglary after entering the home of

an elderly woman, kicking her, and stealing her property. When Thang was seventeen

years and ten months old and serving his sentence at Maple Lane School, a juvenile

detention facility, Thang escaped custody during a field trip to a Seattle Seahawks game

with another juvenile, Simeon Terry.

The pair traveled to Spokane, where Thang broke into the home of eighty-five-

year-old Mildred Klaus. Thang kicked her repeatedly, causing multiple blunt force

injuries, and she ultimately died. He then stole her purse, which contained approximately

$60, disposed of his bloody socks, washed his tennis shoes, and told Terry, "[t]he bitch is

2

dead, this bitch is dead." Clerk's Papers (CP) at 40. Days later, Klaus's son discovered her body lying in a pool of blood.

A jury found Thang guilty of aggravated first degree murder in 1999, although he maintained his innocence and blamed Terry. The trial court imposed the then mandatory sentence of life without parole (LWOP). The court also imposed the $500 victim penalty assessment (VPA), court costs, and restitution. On appeal, this court affirmed. *State v. Thang*, 103 Wn. App. 660, 13 P.3d 1098 (2000). The Washington Supreme Court took review and later reversed, holding the trial court erred in admitting Thang's 1996 burglary and robbery convictions as ER 404(b) identity evidence. *State v. Thang*, 145 Wn.2d 630, 41 P.3d 1159 (2002).

Following retrial in 2003, Thang again argued that Terry committed the crimes, and a jury again found Thang guilty of aggravated first degree murder. The trial court again imposed an LWOP sentence, the $500 VPA, court costs, and restitution. In 2004, this court affirmed his conviction. *State v. Thang*, noted at 121 Wn. App. 1077 (2004).

*Changes in Juvenile Sentencing Law*

In 2012, the United States Supreme Court held that mandatory LWOP sentences for juveniles violate the Eighth Amendment to the United States Constitution. *See generally Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). In response, the Washington Legislature enacted legislation to comply with *Miller*,

commonly referred to as "*Miller*-fix" statutes: RCW 10.95.030 and 10.95.035. *State v. Delbosque*, 195 Wn.2d 106, 110-11 n.1, 456 P.3d 806 (2020); LAWS OF 2014, ch. 130.

For juveniles convicted of aggravated first degree murder committed between ages 16 and 18, RCW 10.95.030(2)(a)(ii) requires a maximum sentence of life imprisonment with a minimum term of at least 25 years. When setting the minimum term, RCW 10.95.030(2)(b) directs courts to consider the "mitigating factors that account for the diminished culpability of youth as provided in *Miller v. Alabama*," including, but not limited to, age, the youth's childhood and life experiences, the degree of responsibility the youth was capable of exercising, and the chances of rehabilitation. Further, any juvenile sentenced to LWOP prior to June 1, 2014 "shall be returned to the sentencing court or the sentencing court's successor for sentencing consistent with RCW 10.95.030." RCW 10.95.035(1).

Because Thang received a mandatory LWOP sentence in 2003 for aggravated first degree murder committed as a 17-year-old, he was required to be resentenced under the *Miller*-fix statutes. RCW 10.95.035(1).

Miller-*Fix Resentencing—Presentence Investigation Report*

Prior to resentencing, the Department of Corrections (DOC) conducted a presentence investigation of Thang and prepared a report (PSI). During the investigation, Thang admitted guilt for the first time. He explained that he escaped from custody while at the Seahawks game because Terry goaded him about his masculinity and courage. He

4

stated that while in Spokane, he entered the victim's home intending to steal items to repay the friends that were housing him. When the victim startled him in the kitchen, he threw her down and kicked her until she stopped moving. He denied premeditation, stating "it just happened." *See* CP at 318-19. He described his actions as "impulsive," "without thought," and the result of anger and resentment toward his family.

Regarding education and employment, the PSI indicated that Thang obtained his high school diploma while housed at Maple Lane and was on the "fast track" to group home placement and college before his escape. The PSI also listed numerous certificates and coursework completed during his incarceration. Thang told the interviewing officer that his school years were difficult because his parents operated a floral business and required him to work there, leaving little time for his studies.

As to family background, Thang explained he was born in Cambodia and the result of a forced marriage and arranged birth. His family fled to Seattle when he was five or six years old. He recalled running from soldiers who were trying to kill his family, and said his mother often told him that, as a loud baby, she had tried to throw him into a river while the family fled the ruling regime in Cambodia. Thang recalled his mother reminding him of his arranged birth and her attempts to drown him when she was upset with him. He acknowledged that his childhood was otherwise free from emotional, physical, or sexual abuse. The PSI also noted that Thang has no official or documented mental health diagnoses.

The PSI also stated that Thang had remained infraction free during his incarceration since 2012. However, his prior infraction history was also before the court. Records showed infractions in 2000 (multiple incidents within six months), 2004 (possession of an edged weapon fashioned as a shank), 2005 (participation in a group resisting staff orders), 2009 (possession of a cell phone), and 2012 (involvement in a multiple inmate fight). Due to Thang's history of violence and escape, the PSI classified him as an escape risk.

The PSI also included a list of mitigating and aggravating factors:

In THANG's case, mitigating factors to a high-end Standard Range sentence include the following:

- THANG was a juvenile at the time he committed the current offense, and a juvenile at the time of his original Robbery and Assault offense.
- THANG has made considerable strides in furthering himself and being a productive inmate during his term of incarceration at Washington State Penitentiary (WSP) at Walla Walla.
- THANG has remained infraction-free since 2012
- THANG has risen through the ranks of the WSP chapter of Toastmasters International, a significant accomplishment requiring dedication and institutional compliance

In addition, aggravating factors exist which would encourage the imposition of a sentence above the low-end of the Standard Range. Those factors include:

- THANG, while incarcerated at Maple Lane for a violent physical assault which occurred during the commission of a burglary, escaped and murdered the victim, Klaus, during the commission of a robbery.
- THANG has a history of similar offenses, with similar outcomes
- THANG has received infractions while housed at WSP for fighting, engaging in gang-related activity, possessing weapons and contraband

6

and participating in group demonstrations which affected the safety and orderly operation of WSP.
- THANG is suspected of being a member of a prison-based gang, the Asian Blood Posse

CP at 285-86.

In conclusion, the PSI recommended 300 months of confinement, with credit for time served, and approximately 192 months of community custody. The report noted a concern that "a finding of premeditation was levied" and added that Thang's statements and the evidence "veer towards a Murder 2nd or Manslaughter charge." CP at 286.

*Resentencing Hearing*

In September 2015, the trial court held a *Miller*-fix resentencing hearing. The State first presented relatives of the victim who delivered impact statements, urging the court to impose the maximum possible punishment and describing the continuing trauma caused by the murder.

*Defense Counsel's Argument*

Thang's counsel addressed the court next, emphasizing the steps Thang had taken to change and improve himself during nearly two decades of incarceration. He explained that Thang earned his high school diploma in custody, completed community college coursework, and received certificates in information technology, bookkeeping, Microsoft Word, and graphic design. He also highlighted Thang's participation in a "Redemption Self-Awareness" program designed to help offenders view their crimes from the victim's perspective, and his active involvement in "Toastmasters" to develop communication

7

skills he lacked as a teenager. He noted that despite limited programming available to LWOP inmates, Thang sought out and completed every class possible, and that his infraction history in later years was minimal.

In addition, counsel played a video of recorded statements made by Thang's parents and sisters, who described Thang's consistent efforts to maintain close family connections. A volunteer chaplain also testified that, though she had never met Thang in person, she had exchanged letters with him since 2014 and was struck by his sincerity, remorse, and mentorship of younger inmates. Defense counsel also submitted a sentencing memorandum for the court's consideration.

*The State's Argument*

The prosecutor spoke next, specifying and addressing the *Miller* factors the court is required to consider. He first argued that the court must consider the character of the offender and the circumstances of the offense. He noted that less than two years before the murder, Thang had committed first degree robbery and burglary against another elderly woman. He also urged the court to evaluate Thang's "truth-telling," reminding the court that Thang blamed the murder on Terry in both trials, throughout his appeals, and even before a federal court, where he alleged the State falsified and presented perjured evidence. The prosecutor added that he was surprised to learn from the PSI report that Thang had admitted responsibility for the murder and asked the court to consider whether the admission was merely self-serving.

Turning to Thang's background and development, the prosecutor emphasized Thang's above-average intelligence and the absence of any documented mental illness, disability, or social problems. He argued that although Thang claimed difficulties understanding the moral expectations and laws of the United States, that excuse carried little weight after his prior robbery and burglary convictions. With respect to Thang's family life and home environment, the prosecutor argued there was no evidence that Thang suffered physical or mental abuse. Instead, Thang had lived with his parents and siblings while working and attending school.

Addressing the crime itself, the prosecutor stressed that no peer or family pressure contributed to the offense. He contended that Thang had alternatives when confronted by the victim, such as exiting the home, but instead chose to brutally beat her to death. He noted that there was no evidence that Thang was intoxicated when he committed the crimes. The prosecutor rejected the PSI's suggestion that the circumstances and evidence might have supported a lesser conviction, reminding the court that two juries had convicted him of premeditated aggravated murder. The prosecutor concluded by asking the court to impose life without parole, reimpose restitution and court appointed attorney fees, and order lifetime no-contact with the victim's family.

*Defense Counsel's Rebuttal Argument*

During rebuttal argument, Thang's attorney emphasized his resilience, family support, and capacity for rehabilitation. He stressed that despite long separations,

9

transfers, and restrictions on visitation, Thang maintained close relationships with his family, particularly his sister and niece. He also underscored Thang's early years as a Cambodian refugee, noting the hardships of displacement, poverty, and then social alienation in the United States as a young kid. Turning to sentencing, he urged the court to adopt the PSI writer's recommendation of 25 years to life, emphasizing that such a sentence would reflect both the seriousness of the offense and Thang's rehabilitation.

*Thang's Allocution*

Thang spoke next. He admitted sole responsibility for the victim's death and apologized to her family. He added that he intended to make good choices while in prison and would try to help others avoid the same mistakes he made.

*The Trial Court's Oral Ruling*

The court began by acknowledging the brutality of the crime and thanking the victim's family for attending and speaking:

> And so, first, I do want to observe additionally that this murder of Ms. Klaus was undeniably brutal, awful, not necessary, and involved a lot of suffering on her part, in that as the medical evidence showed that, and of course Mr. Thang didn't know this at the time, but it's possible and likely that Ms. Klaus suffered for an extended period of time following the assault on her. So, in that respect I'm sure to the Klaus family members, this does seem like it's happening all over again. And that's an awful feeling, I'm quite sure, and I do want to express appreciation for the family members who did speak this morning. And seeing them and hearing what they had to say, it impresses the Court that indeed this family, the Klaus family, is a close-knit family, a very loving family, who have experienced a terrible,

10

terrible loss.  And so, the Court appreciates your presence here and your thoughts on the matter.

Rep. of Proc. (RP) at 49-50.

The court then reflected on Thang's family background and criminal history. While acknowledging that Thang came from a relatively close-knit family, the court noted that "something went awry" during his teenage years, as evidenced by his convictions.  The court emphasized the "bitter irony" that Thang had been on a positive trajectory at Maple Lane, performing so well that he was considered a candidate for higher education and was rewarded with a field trip to a Seahawks game.  That reward, however, created the opportunity for his escape, his trip to Spokane, and the events that ultimately led to the murder.

The court next acknowledged that it considered the *Miller* factors:

> So I looked at the Miller factors and have considered those, and it would appear that they are not only factors the court should consider for—in direct relation to a sentencing order but rather in addition to that, principles that apply through that Miller case.  And given the advancement and the progress, development of further knowledge insofar as neurological development of children, the scientific evidence is now strong.  That evidence shows that the brains of youthful people do not finish, that the development does not conclude at adolescence, but rather concludes on into young adulthood, and the science is extensive.  There have been many studies.  Miller has addressed that, and really there's no longer any dispute that, in fact, that's the case, in that people who are not adults, less than 18, need to be treated differently and with a consideration of the individual circumstances of that particular person.  So among the principles is the US Supreme Court, we must follow the rule of law, which certainly the Supreme Court is the ultimate authority.  And the Supreme Court has indicated among the principles that, first, sentencing a juvenile to life in prison without possibility of a parole should be an unusual and rare event,

11

and that's not to say that a life sentence without parole is not permitted. It is permitted, but only after considering other factors that tend to justify that result, again from an individual perspective.

And secondly, as I may have inferred and said a moment ago, juveniles are constitutionally different from adults. They're subject to a number of influences, including peer pressure, and including the changing nature of the juveniles' character and personality and world view, to summarize that.

Third, the trial court needs to consider the individual circumstances of the particular homicide-type offense to include the juvenile's participation level and the way these other pressures may have affected that juvenile. As pointed out by the state[sic], one of the factors or one of the influences required to be considered is whether or not there was substance abuse, there was physical abuse or other influences in that youthful person's family setting and life which played a part in motivating that person to do what he or she did.

Lastly, the court is required to take into consideration that juveniles are more capable of change than adults are, and as a result, actions of juveniles are not as likely to be evidence of an irretrievably depraved character, as the court described that factor, that principal [sic]. And so, the Supreme Court has said, just to sum all that up, that only a juvenile whose offense, homicide offense, reflects irreparable corruption, only those juveniles should receive life sentences without possibility of parole.

So then as to the factors, the individual specific factors, the Court is required to consider the character of the offender and the circumstances of the offense; the background and mental and emotional development of the youthful defendant; the juvenile's chronological age and hallmark features to include immaturity, impulsiveness or impetuosity, failure to appreciate risks and consequences. And I have considered all these, I would add, as I indicated at the outset. And the family home environment that surrounds the juvenile, no matter how brutal or dysfunctional.

RP at 51-53. The court then addressed each factor in detail.

The court first discussed Thang's family home environment. It observed that while his upbringing was "far from perfect," it did not reflect the kinds of dysfunction commonly seen in other juvenile homicide cases. The court noted that Thang's parents

12

were immigrants with limited English proficiency and that he had been required to work from an early age to support the family. It also recounted the traumatic history described in the record: while fleeing the ruling regime in Cambodia, Thang's mother attempted to throw him into a river as an infant because his crying threatened the family's safety—an experience the court acknowledged could not have been remembered by Thang except for recitation from family, which could have a lasting emotional impact. At the same time, the court emphasized that Thang's home life lacked common risk factors such as parental substance abuse, mental illness, or physical abuse.

The court turned to the circumstances of the crime. The court acknowledged the PSI suggested that Thang could have been convicted of a lesser crime but stated that two juries had convicted Thang of aggravated first degree murder. The court said it was not entirely clear whether Thang had entered the victim's home intending to murder somebody, but he nonetheless made the "abysmally awful and poor decision" to assault the victim.

Next, the court discussed Thang's potential for rehabilitation. The court indicated it had considered Thang's "track record" while incarcerated. It recognized that Thang completed numerous programs aimed at promoting self-awareness, personal growth, and communication skills, and had earned several awards for his participation. The court further noted his consistent work ethic, observing that he was punctual, diligent, and

13

never caused problems in his assignments. The court commended Thang for being a self-taught electrician and for receiving awards recognizing his skills in that field.

The court then stated:

> So, the court sees a number of countervailing interpretations here applying the factors identified and the principles as well in reference to imposition of the sentence requested by the state [sic], life in prison without parole or that suggested by the PSI writer and defense counsel of 25 years to life. And in either case, as we know, the Indeterminate Sentence Review Board has the task and responsibility of addressing a specific release, whether that's appropriate at all. So we do know that according to the statute, that I've just started to talk about, 10.95.030 that our legislature has enacted a quote, fix, unquote, to address the aftermath of the Supreme Court, US Supreme Court *Miller* case. And so, as I've just summarized, that is the set of alternatives that form the framework for a court's sentencing of an individual such as Mr. Thang.
>
> The court has reviewed all the materials, but in reference to, as I speak right now the presentence investigative reports, and particularly the one of 2015, as said, that PSI describes in detail the aggravating and mitigating factors that are present in the case from that person's point of view.

RP at 57.

The court then recited the mitigating factors in the PSI report followed by the aggravating factors. The court also found that Thang posed an "escape risk" which was an additional aggravating factor.

The court ended by summarizing the PSI report's recommendations and announcing its ruling:

> So, the PSI writer recommends, as we know, a resentencing of 300 months, with credit for time already served, which is about 192 months, and then jurisdiction to be conferred to the Indeterminate Sentence Review Board for further action as deemed appropriate. So, Counsel, I do see that

14

there is some countervailing points here. One is the offense itself is brutal, a lot of violence involved. Considerable likely agony for an extended period of time on the part of the victim, Ms. Klaus. The other aggravating factors that I've identified are present. Contrasted to that is the achievement that Mr. Thang has accomplished in several distinct areas. He has not had infractions, as said, and he's gone up in esteem of his fellow members of groups in the institution. And beyond that, there has been, in the court's view, an expression of genuine remorse.

And obviously, we're not talking about an exceptional sentence either up or down, but these are factors, I believe, that *Miller v. Alabama* urges the Court and requires the Court to consider when sentencing a person who committed a homicide offense as a juvenile, while still a juvenile. And I would not hesitate to observe further that at the time of the offense, Mr. Thang, although still a juvenile, was on the threshold of becoming 18 years of age.

So, I have all those factors in mind, Counsel, and your comments, again. And with that in mind, the court would find the following sentence to be appropriate: 420 months to life.

RP at 60-61.

The court imposed an indeterminate sentence of 420 months to life with credit for time served, ordered community custody for life under the supervision of the Indeterminate Sentence Review Board (ISRB), and entered a lifetime no contact order protecting the victim's family. The court also found Thang indigent and imposed the $500 victim penalty assessment, $200 criminal filing fee, $100 DNA collection fee, and restitution. The trial court did not enter written findings and conclusions.

In 2016, Thang filed a PRP challenging the constitutionality of RCW 10.95.030, arguing its distinction between 15-year-olds and 16- and 17-year olds was arbitrary. *In Re Pers. Restraint of Thang*, No. 34798-2-III, slip op at 1-11 (Wash. Ct. App. July 30, 2019)

15

(unpublished), https://www.courts.wa.gov/opinions/pdf/347982_unp.pdf. This court,

however, dismissed his PRP in 2019 and his conviction became final in July 2020.

Approximately three years later, in January 2024, Thang filed a notice of appeal

from his 2015 felony judgment and sentence. He requested an enlargement of time

because he had not been advised of his right to appeal following resentencing. A

commissioner of this court granted Thang's request and permitted this appeal to proceed.

Comm'r's Ruling, No. 40197-9-III (May 23, 2024).

## ANALYSIS

### 1. MITIGATING QUALITIES OF YOUTH

Thang argues the resentencing court erred by balancing mitigating and retributive

factors rather than prioritizing and focusing on the mitigating qualities of youth. The

State responds that the court properly addressed the *Miller* factors and emphasized the

mitigating factors.

### A. Standard of Review

A sentencing court's decision is reviewed for "'clear abuse of discretion or

misapplication of the law.'" *State v. Haag*, 198 Wn.2d 309, 317, 495 P.3d 241 (2021)

(internal quotation marks omitted) (quoting *State v. Delbosque*, 195 Wn.2d 106, 116, 456

P.3d 806 (2020)). "'A trial court abuses its discretion when its decision is manifestly

unreasonable or based upon untenable grounds.'" *Id*. (internal quotation marks omitted)

(quoting *Delbosque*, 195 Wn.2d at 116). "A decision is based on untenable grounds

16

when its factual findings are unsupported by the record." *Id*. "'We review findings of fact for substantial evidence, which exists where there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding.'" *Haag*, 198 Wn.2d at 317 (internal quotation marks omitted) (quoting *Delbosque*, 195 Wn.2d at 116).

### B. Legal Principles

Since the enactment of the *Miller*-fix statutes, the Washington Supreme Court has issued a series of decisions clarifying the requirements for *Miller* resentencings.

In *State v. Ramos*, 187 Wn.2d 420, 437-43, 387 P.3d 650 (2017), the court held that "*Miller* applies equally to literal and de facto [LWOP] sentences." The court explained that *Miller* resentencings require more than conclusory recitations about the differences between juveniles and adults. *Id.* at 443. Rather, courts must "meaningfully consider how juveniles are different from adults, how those differences apply to the facts of the case, and whether those facts present the uncommon situation where a life-without-parole sentence for a juvenile homicide offender is constitutionally permissible." *Ramos*, 187 Wn.2d at 434-35. More specifically, the Ramos court explained:

> The [resentencing] court must receive and consider relevant mitigation evidence bearing on the circumstances of the offense and the culpability of the offender, including both expert and lay testimony as appropriate. The court and counsel have an affirmative duty to ensure that proper consideration is given to the juvenile's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences." It is also necessary to consider the juvenile's "family and home environment" and "the circumstances of the

17

homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him." And where appropriate, the court should account for "incompetencies associated with youth" that may have had an impact on the proceedings, such as the juvenile's "inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys."

. . . The sentencing court must thoroughly explain its reasoning, specifically considering the differences between juveniles and adults identified by the *Miller* Court and how those differences apply to the case presented. While formal written findings of fact and conclusions or law are not strictly required, they are always preferable to ensure that the relevant considerations have been made and to facilitate appellate review.

*Ramos*, 187 Wn.2d at 443-44 (alteration in original) (internal citations omitted) (quoting

*Miller*, 567 U.S. 477-78).

In 2020, the court clarified that "resentencing courts must consider the measure of

rehabilitation that has occurred since a youth was originally sentenced to life without

parole." *Delbosque*, 195 Wn.2d at 121. Accordingly, *Miller* resentencings must be

forward looking, focusing on rehabilitation rather than the past. *See Id.* at 122. The court

ultimately reversed the *Miller* resentencing decision at issue in the case, noting that the

resentencing court did not have the benefit of *Ramos* or *Bassett* to guide its decision

because resentencing occurred before those cases were decided. *Id.* at 120.

Following *Delbosque*, the Supreme Court issued two opinions that further refined

the standards for effective juvenile sentencing. In *Haag*, the court reversed a juvenile

sentence upon concluding that the trial court failed to properly consider and emphasize

the mitigating qualities of youth. 198 Wn.2d at 325-26. In *State v. Anderson*, the court

affirmed a lengthy juvenile sentence, commending the sentencing court for its thorough

18

and correct application of the mitigating factors. 200 Wn.2d 266, 516 P.3d 1213 (2022).

While these two cases had not yet been published at the time of Thang's sentencing, they

nevertheless frame our analysis. Thang argues that the sentencing court's analysis in his

case mirrored *Haag*, while the State contends the analysis followed *Anderson*. We

therefore take a close look at these two cases.

In *Haag*, the supreme court remanded for a second *Miller* resentencing hearing

after finding that the trial court "improperly placed *more* emphasis on retribution than on

mitigation." 198 Wn.2d at 323. Haag was originally sentenced to life without parole for

the aggravated first degree murder of a 7-year-old girl when he was 17 years old. *Haag*,

198 Wn.2d at 313-14. During the resentencing hearing, Haag presented extensive

mitigating evidence through expert and lay witnesses. *Id.* at 314-15. The evidence

demonstrated a troubled childhood involving abandonment, bullying, psychological

maltreatment, and difficulty expressing his sexual orientation. *Id*. Haag also produced

evidence showing that he was capable of rehabilitation, demonstrating that he matured in

prison, had only one infraction since 1997, earned a high school diploma, and had steady

prison employment. *Id*. Additionally, a prison chaplain described him as "a mature

adult", and two expert evaluations finding low risk of reoffending and no serious mental

health issues. *Id.* at 314. Haag also testified, expressed sincere remorse, and requested a

25-year minimum sentence. *Id.* at 314-15.

Although acknowledging that the State had failed to rebut Haag's evidence of rehabilitation, the superior court nonetheless found that Haag had not shown he had addressed or overcome the factors that led to the crime. *Id.* at 312-15. The court then imposed a 46-year minimum sentence, explaining:

> So the Court is faced with the daunting task of properly weighing a multiplicity of factors, which include a vile, cowardly, and particularly heinous multi-step strangulation and drowning of a defenseless, sixty-five pound little girl committed by a three hundred pound[,] seventeen-year-old young man that resulted in a convict[ion] for aggravated murder in the first degree. I'm also to consider the then-youthful brain of Mr. Haag with diminished decision-making capacity, who simultaneously lived through some very difficult circumstances while still enjoying a supportive relationship and activities. And also, a man convicted of murder who has exhibited a stellar track record in prison and has been assessed as a low risk for violently re-offending.
>
> In balancing these pieces of the puzzle, the *Miller* court and the statutory factors, and all the other factors that I mentioned earlier, the Court does now hereby impose a sentence—a minimum sentence of forty-six years in prison and a maximum of life in prison.

*Id.* at 315-16.

The supreme court reversed Haag's sentence, holding that the sentencing court "placed more emphasis on retribution than mitigation." *Id.* at 317. In particular, the court noted that the resentencing court's focus on retribution was "stark" based on its statement that "rehabilitation is not the sole measure in sentencing" and that under the "retributive theory, severity of the punishment is calculated by the gravity of the wrong committed." *Id.* at 323.

20

Analyzing the mitigating factors of youth, the supreme court noted that the resentencing court made only cursory references to the defendant's youth, while focusing primarily on the victim's age. *Id.* at 323-24. Furthermore, the resentencing court overlooked voluminous and uncontroverted evidence that the defendant was capable of rehabilitation. *Id.* at 324. The court concluded that the resentencing court's explanation of its sentence, set forth above, "shows its focus was backward looking, driven by retribution and not mitigation." *Id.* at 323. The court held that "retributive factors must count for less than mitigating factors." While this does not prohibit courts from taking into account retributive factors, the key question is whether the juvenile is capable of change. *Haag*, 198 Wn.2d at 325.

One year later, in *Anderson*, the Supreme Court again addressed a *Miller*-fix resentencing, this time affirming the juvenile's 61-year sentence. 200 Wn.2d 266. In *Anderson* the defendant was convicted of two counts of aggravated first degree murder for killing witnesses during a planned robbery. *Id.* at 271. Although Anderson was 17½ years old when the crimes were committed, he was not identified or apprehended until several years later. *Id*.

At his resentencing, Anderson argued that his crimes were the result of impulsivity and immaturity. *Anderson*, 200 Wn.2d at 273. In support of a lower sentence, Anderson submitted evidence on the general brain development of juveniles and his poor decision-making skills as a teenager. He also allocuted, admitting responsibility for the first time

and described a difficult family life growing up. Finally, Anderson submitted supportive letters, dozens of certificates of participation, proficiency, completion, recognition, and achievement for various programs he participated in while incarcerated. *Id.* at 273.

The resentencing court began by explaining the purpose of a *Miller* resentencing in light of the supreme court's decision in *Ramos,* discussing juvenile brain development and the specific factors to consider. *Id.* at 275. The court then noted that while most adolescents were not as culpable as adults, this case was different. Here, in the years between committing these murders and being charged with them, Anderson continued committing assaultive offenses even after spending time in a structured environment with treatment at juvenile rehabilitation and after reaching adulthood. *Id.* at 275. The sentencing court then addressed each *Miller* factor, applied it to the facts of the case, and ultimately concluded that significant evidence undermined Anderson's claims that he was impetuous when he committed the crime, remorseful following the crime, and capable of rehabilitation. *Id.* at 276.

First, the court found that although Anderson claimed to have acted impulsively, the record contradicted his claim and demonstrated that the murders were planned in advance. *Id.* Second, the court determined that Anderson had not shown that immaturity was a factor in the crimes as he was 17½ years old, living in his own apartment, and in control of his environment. *Id.* Next, the court found that Anderson understood the consequences of his actions, noting that he bragged about his crimes in letters to various

22

girlfriends while incarcerated on other crimes. *Id*. In the letters the defendant admitted the murders were premeditated and even enclosed pictures of his victims. *Id.* at 276-77. The court took this evidence to show awareness of consequences and lack of remorse. *Id.*. The court also emphasized that Anderson had denied responsibility for years, and only admitted involvement at resentencing, undermining his claim of genuine remorse. *Id.* at 277. Last, the court acknowledged his accomplishments in prison, praised them, and encouraged continued progress. *Id*.

Ultimately, the resentencing court found that Anderson presented no evidence supporting the assertion that he acted impetuously, was immature, or did not understand the consequences of his actions. *Id*. It concluded that, under *Ramos*, Anderson failed to meet his burden of proof to show immaturity at the time of the offense and resentenced him to the original 736 month sentence. *Id*.

On appeal, the supreme court praised the resentencing court's application of the *Miller* factors. *Id.* at 278-80. It held that the resentencing court individually addressed each of the *Miller* factors and "considered how those differences applied to this case." *Id*. at 290. Unlike the resentencing in *Haag*, the resentencing court in *Anderson* did not place more emphasis on retribution and focused on Anderson's youthfulness, not the victim's age. *Id*. at 290-91. Instead of balancing rehabilitation against mitigation, the *Anderson* court properly weighed competing evidence, determined that Anderson's mitigating evidence was drastically undermined by other evidence, and concluded that

Anderson failed met his burden of demonstrating that his "crimes reflected youthful immaturity, impetuosity, or failure to appreciate risks and consequences." *Id*. at 291.

## C. Application

Thang equates his case to *Haag*. He contends the resentencing court did not focus primarily on mitigating factors but instead weighed aggravation and mitigation as countervailing considerations. The State compares Thang's case to *Anderson* and argues the trial court meaningfully considered mitigation evidence and imposed a sentence substantially below the State's request of life without parole. In his reply brief, Thang maintains that *Anderson* is distinguishable.

As a preliminary matter, we acknowledge the unique procedural posture of this case. Thang was resentenced in 2015 but is on direct appeal from that resentencing because he was not advised of his appellate rights. Although the trial court did not have the benefit of *Ramos*, 187 Wn.2d 420, *Delbosque*, 195 Wn.2d 106, *Haag*, 198 Wn.2d 309, and *Anderson*, 200 Wn.2d 266, at the time of resentencing, those cases still applied. Collectively, these cases reaffirm that courts conducting a *Miller* resentencing "'"must *meaningfully* consider how juveniles are different from adults[ and] how those differences apply to the facts of the case."'" *Haag* at 320 (alteration in original) (quoting *Delbosque*, 195 Wn.2d at 121 (quoting *Ramos*, 187 Wn.2d at 434-35)). In this case, we conclude that the resentencing court's analysis fell short of that requirement.

Here, like in *Haag*, the trial court began with a focus on the brutality of the crime, the victim's suffering, and the impact on the family. Only after reciting these retributive considerations did the court recite the *Miller* factors it was to consider. This initial framing suggested that punishment and victim impact were the lens through which the court viewed mitigation, rather than the other way around.

The court gave only cursory treatment to the hallmark features of youth: immaturity, impetuosity, and failure to appreciate risks and consequences. *Ramos*, 187 Wn.2d at 443. Indeed, the court acknowledged the factors and then simply stated that it had considered them without any further analysis or application.

Although the State argues the court considered these features of youth when it described Thang's escape as unplanned, the court never connected that observation to culpability or the features of youth. Nor did it meaningfully analyze how peer pressure or immaturity influenced Thang's choices, such as the pressure from a friend challenging his masculinity before the escape, or his decision to steal in order to repay friends for housing him in Spokane. Instead, the court collapsed its analysis into whether the murder was "premeditated" or not, sidestepping the inquiry into immaturity, impulsivity, and appreciation of risks and consequences. By contrast, in *Anderson,* the resentencing court explicitly rejected the defendant's claims of immaturity, impetuosity, and failure to appreciate consequences only after a thorough, factor-by-factor analysis supported by the record. 200 Wn.2d at 276-77.

25

The resentencing court did consider Thang's family background. The court

acknowledged Thang's family's traumatic flight from Cambodia and his mother's

repeated efforts to drown him as an infant but contrasted this with the lack of evidence

that Thang's household included any physical abuse and substance use. On appeal,

Thang contends that the sentencing court improperly minimized the effect of his

traumatic childhood and diminished its relevance to his culpability, but this argument

misconstrues our role on appeal. While we review the sentencing court's application of

mitigating factors to determine if the court properly emphasized mitigation over

retribution, a sentencing court retains discretion to determine whether youthful factors

contributed to the offense. *Haag*, 198 Wn.2d at 326.

Finally, a court conducting a *Miller* resentencing must also consider whether the

juvenile has demonstrated progress, rehabilitation, and the capacity for change since their

original sentence. *Delbosque*, 195 Wn.2d at 121. This requires a forward-looking focus

on rehabilitation, rather than emphasis on retribution. *Haag*, 198 Wn.2d at 321.

Here, after identifying Thang's accomplishments and work ethic while in prison,

the court stated that it saw "a number of countervailing interpretations here applying the

factors." RP at 57. The court then listed out the mitigating and aggravating factors listed

in the PSI, then again stated:

> So, Counsel, I do see that there is [sic] some *countervailing* points here.
> One is the offense itself is brutal, a lot of violence involved. Considerable
> likely agony for an extended period of time on the part of the victim . . . .
> The other aggravating factors that I've identified are present. Contrasted to

26

that is the achievement that Mr. Thang has accomplished in several distinct
areas. He has not had infractions, as said, and he's gone up in esteem of his
fellow members of groups in the institution. And beyond that, there has
been, in the court's view, an expression of genuine remorse.

RP at 60 (emphasis added).

We agree with Thang that this analysis shows that the sentencing court balanced

rehabilitation against retribution and improperly emphasized the brutal and violent nature

of the offense over Thang's demonstrated capacity for change. In a *Miller*-fix hearing,

retribution and rehabilitation are not equal factors to be balanced against each other.

While a court conducting a *Miller* resentencing can still consider the nature of the

offense, the "retributive factors must count for less than mitigating factors." *Haag*, 198

Wn.2d at 325.

We conclude that the resentencing court's focus on the brutality of the crime, its

cursory treatment of youth-related features, and its balancing of mitigation against

aggravation show a misapplication of the law. Accordingly, we vacate Thang's sentence

and remand for a new *Miller* resentencing. Following the hearing, the resentencing court

should enter written findings and conclusions to facilitate appellate review.[2]

---

[2] Thang also challenges several of the resentencing court's oral findings as
unsupported by substantial evidence, the court's term of community custody, and the
imposition of fines and fees. Appellant's Br. at 40, 42, 44. Because the court will enter
new findings and conclusions on remand, we decline to address these challenges.

2.  CRUEL AND UNUSUAL PUNISHMENT

Thang argues that RCW 10.95.030 imposes unconstitutional cruel punishment on *Miller*-class juvenile offenders. He points out that unlike *Monschke*[3]-class defendants resentenced under RCW 10.95.035, *Miller*-class defendants face additional burdens including: mandatory community custody, potential lifetime supervision by the ISRB, and denial of earned early release credits. Thang contends that these features create harsher punishment for *Miller*-class juveniles.

As a threshold matter, the State responds that this issue is not preserved for review. It emphasizes that Thang did not raise a constitutional challenge to RCW 10.95.030 in the trial court, nor did he argue in his opening brief that review is warranted under RAP 2.5(a)(3). Resp't's Br. at 67-70. Thang replies that this issue is reviewable under RAP 2.5(a)(3). Alternatively, he argues that issue preservation principles do not apply or that we should exercise our discretion to review this issue.

We generally decline to review an issue raised for the first time on appeal. *See* RAP 2.5(a). "The rule reflects a policy of encouraging the efficient use of judicial resources. The appellate courts will not sanction a party's failure to point out at trial an error which the trial court, if given the opportunity, might have been able to correct to avoid an appeal and a consequent new trial." *State v. Scott*, 110 Wn.2d 682, 685, 757

---

[3] *In re Pers. Restraint of Monschke*, 197 Wn.2d 305, 482 P.3d 276 (2021) (plurality opinion).

P.2d 492 (1988). The rule derives from the principle that trial counsel is obligated to seek a remedy to errors as they occur, or shortly thereafter. *See City of Seattle v. Harclaon*, 56 Wn.2d 596, 597, 354 P.2d 928 (1960).

However, an exception to RAP 2.5 permits a party to raise a "manifest error affecting a constitutional right" for the first time on appeal. RAP 2.5(a)(3). This exception is narrow and "does not permit *all* asserted constitutional claims to be raised for the first time on appeal." *State v. Kirkman*, 159 Wn.2d 918, 934, 155 P.3d 125 (2007) *(*quoting *Scott*, 110 Wn.2d at 688). Rather, the asserted error must be "manifest," which "requires a showing of actual prejudice." *Kirkman*, 159 Wn.2d at 935 (quoting *State v. Walsh*, 143 Wn.2d 1, 8, 17 P.3d 591 (2001)) To demonstrate actual prejudice, there must be a plausible showing by the appellant that the asserted error had practical and identifiable consequences during trial. *State v. WWJ Corp.*, 138 Wn.2d 595, 603, 980 P.2d 1257 (1999). "[T]he focus of the actual prejudice must be on whether the error is so obvious on the record that the error warrants appellate review." *State v. O'Hara*, 167 Wn.2d 91, 99-100, 217 P.3d 756 (2009).

In his opening brief, Thang failed to address whether the issue was preserved. The State argues that while this issue is constitutional in nature, the alleged error is not

manifest. In his reply brief, Thang argues for the first time that this error is reviewable

for the first time on appeal as a manifest constitutional error. But an issue raised for the

first time in a reply brief is too late to warrant consideration. *Cowiche Canyon*

*Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

Even so, we conclude that this error is not manifest. Thang's argument relies on

*In re Personal Restrain of Monschke*, 197 Wn.2d 305 (plurality opinion), where the

Washington Supreme Court held that mandatory life without parole sentences for

offenders who committed aggravated first degree murder between the ages of 18 and 20

were unconstitutional and that courts must consider those offenders' youthfulness during

resentencing. But *Monschke's* ruling would not have been obvious on the record to the

resentencing court in 2015. As a result, the alleged error is not manifest.

Thang alternatively argues that issue preservation principles do not apply to this

issue. Principles of issue preservation do not apply where the following four conditions

are met:

> (1) a court issues a new controlling constitutional interpretation material to the defendant's case, (2) that interpretation overrules an existing controlling interpretation, (3) the new interpretation applies retroactively to the defendant, and (4) the defendant's trial was completed prior to the new interpretation.

*State v. Robinson*, 171 Wn.2d 292, 305, 253 P.3d 84 (2011).

Thang contends that *State v. Carter*, 3 Wn.3d 198, 548 P.3d 935 (2024)[4] is material to his case because it "changes the landscape of what is considered cruel punishment when it comes to *Miller*-class defendants." Reply Br. at 14. He argues that *Carter* applies to his appeal and points out that his trial was completed prior to that decision. But again, Thang raises this issue for the first time in his reply brief, which is too late for this court to consider. *Cowiche Canyon*, 118 Wn.2d at 809. Addressing issues raised for the first time in a reply brief is unfair to the other party who was not given the opportunity to respond. *Ainsworth v. Progressive Casualty Insurance Co.*, 180 Wn. App. 52, 78 n.20, 322 P.3d 6 (2014). Regardless, Thang's argument that *Carter* changes the landscape for *Miller*-class defendants is unpersuasive. *Carter* concerned a resentencing court's discretion regarding *Monschke*-class defendants, not *Miller*-class defendants. Carter, 3 Wn.3d at 216.

Last, Thang contends that this court retains discretion to review errors not appealed as a matter of right. Under RAP 2.5(a), this court has the discretion to accept review of claimed errors not appealed as a matter of right. *See State v. Blazina*, 182 Wn.2d 827, 834-35, 344 P.3d 680 (2015). But again, Thang raises this argument for the first time in his reply brief.

---

[4] In *Carter*, the supreme court held that, under RCW 10.95.030(1), when resentencing based on *Monschke*, the trial court has discretion to impose a determinate sentence of any length or life without the possibility of parole. 3 Wn.3d at 216. However, a sentence of life with the possibility of parole is not authorized. *Id*. at 216-17.

Considering our conclusion that the issue was not preserved and the record was not developed, along with our decision to remand for resentencing, we decline review of this issue at this time. Thang is free to raise the issue below and develop the record.

We reverse Thang's sentence and remand for resentencing.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Staab, J.

WE CONCUR:

_____
Lawrence-Berrey, C.J.

_____
Murphy, J.

32